[Crim. Nos. 16232, 16237. In Bank. Dec. 4, 1972.]

In re JOHN LYNCH on Habeas Corpus.

(Consolidated Cases.)

## COUNSEL

John Lynch, in pro. per., and Ezra Hendon, under appointment by the Supreme Court, for Petitioner.

Howard J. Berman and Morton P. Cohen as Amici Curiae on behalf of Petitioner.

Evelle J. Younger, Attorney General, Edward A. Hinz, Jr., Chief Assistant Attorney General, Doris H. Maier, Assistant Attorney General, Daniel J. Kremer, Edward W. Bergtholdt, A. Wells Petersen and Edward P. O'Brien, Deputy Attorneys General, for Respondent.

## OPINION

**MOSK, J.**—One who commits an act of indecent exposure in California is guilty of a simple misdemeanor and can be punished by no more than a brief jail sentence or a small fine.[1] If he commits the identical act a second time, however, the law declares him guilty of a felony and inflicts on him a punishment of imprisonment in the state prison for the indeterminate period of one year to life.[2] We adjudicate here the question whether the aggravated penalty for second-offense indecent exposure provided by Penal Code section 314 violates the prohibition of the California Constitution against cruel or unusual punishments. (Cal. Const., art. I, § 6.) We conclude that the penalty offends the Constitution in the respect charged, and petitioner is therefore entitled to relief.

The issue is presented by John Lynch, a state prison inmate. In 1958 he was convicted of misdemeanor indecent exposure in violation of former Penal Code section 311, the predecessor of section 314. For this offense he spent two years on probation. In 1967 he was again convicted of indecent

---

[1]Under Penal Code section 19 the maximum possible penalty for such an offense is a sentence to county jail not exceeding six months or a fine not exceeding $500, or both.

[2]Penal Code section 314 provides: "Every person who willfully and lewdly, . . . .

"1. Exposes his person, or the private parts thereof, in any public place, or in any place where there are present other persons to be offended or annoyed thereby: . . . is guilty of a misdemeanor.

"Upon the second and each subsequent conviction under subdivision 1 of this section, or upon a first conviction under subdivision 1 of this section after a previous conviction under Section 288 of this code [lewd or lascivious acts upon a child], every person so convicted is guilty of a felony, and is punishable by imprisonment in state prison for not less than one year."

exposure. The court ruled he was not a mentally disordered sex offender, denied probation, and sentenced him to prison for the indeterminate term provided by section 314 in the case of a second offense. The conviction was affirmed on appeal, and petitioner thereafter filed two applications for habeas corpus in this court: in Crim. No. 16232 he levels various constitutional challenges to the power of the Adult Authority to continue holding him under the 1967 conviction, while in Crim. No. 16237 he attacks the validity of the 1958 conviction. We consolidated the applications, issued an order to show cause, and appointed counsel.

I

We inquire, first, whether petitioner's indeterminate sentence under the 1967 conviction constitutes cruel or unusual punishment within the meaning of the California Constitution. We approach this issue with full awareness of and respect for the distinct roles of the Legislature and the courts in such an undertaking. ■ We recognize that in our tripartite system of government it is the function of the legislative branch to define crimes and prescribe punishments, and that such questions are in the first instance for the judgment of the Legislature alone. (*People* v. *Bauer* (1969) 1 Cal. 3d 368, 375 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398]; *People* v. *Knowles* (1950) 35 Cal.2d 175, 181 [217 P.2d 1]; *People* v. *Tanner* (1935) 3 Cal.2d 279, 298 [44 P.2d 324].)

Yet legislative authority remains ultimately circumscribed by the constitutional provision forbidding the infliction of cruel or unusual punishment, adopted by the people of this state as an integral part of our Declaration of Rights. It is the difficult but imperative task of the judicial branch, as coequal guardian of the Constitution, to condemn any violation of that prohibition. ■ As we concluded in *People* v. *Anderson* (1972) 6 Cal.3d 628, 640 [100 Cal.Rptr. 152, 493 P.2d 880], "The Legislature is thus accorded the broadest discretion possible in enacting penal statutes and in specifying punishment for crime, but the final judgment as to whether the punishment it decrees exceeds constitutional limits is a judicial function." (Accord, *Furman* v. *Georgia* (1972) 408 U.S. 238, 269 [33 L. Ed.2d 346, 366, 92 S.Ct. 2726] (opinion of Brennan, J.); *Trop* v. *Dulles* (1958) 356 U.S. 86, 103-104 [2 L.Ed.2d 630, 643-644, 78 S.Ct. 590] (plurality opinion of Warren, C. J.); *Weems* v. *United States* (1910) 217 U.S. 349, 378-379 [54 L.Ed. 793, 803, 30 S.Ct. 544].)

We add that the determination of whether a legislatively prescribed punishment is constitutionally excessive is not a duty which the courts eagerly assume or lightly discharge. Here, as in other contexts, " 'mere doubt does

not afford sufficient reason for a judicial declaration of invalidity. Statutes must be upheld unless their unconstitutionality clearly, positively and unmistakably appears.' " (*In re Dennis M.* (1969) 70 Cal.2d 444, 453 [75 Cal. Rptr. 1, 450 P.2d 296], and cases cited.) When such a showing is made, however, we must forthrightly meet our responsibility "to ensure that the promise of the Declaration of Rights is a reality to the individual." (*People* v. *Anderson* (1972) *supra,* 6 Cal.3d 628, 640.) As our Chief Justice recently explained, "By observing this cautious, often burdensome and sometimes unpopular procedure, the courts can often prevent the will of the majority from unfairly interfering with the rights of individuals who, even when acting as a group, may be unable to protect themselves through the political process. In this way, judicial review assures a government under the laws." (Wright, *The Role of the Judiciary: From Marbury to Anderson* (1972) 60 Cal.L.Rev. 1262, 1268.)

At the outset we emphasize that petitioner does not contend the indeterminate sentence law is invalid on its face or that an indeterminate sentence of any length whatever constitutes cruel or unusual punishment. Such a contention has already been rejected. (*People* v. *Wade* (1968) 266 Cal. App.2d 918, 927-929 [72 Cal.Rptr. 538].) ■ His position, rather, is that the constitutional prohibition is violated by the particular indeterminate sentence imposed on him pursuant to Penal Code section 314. We begin, therefore, by determining what in fact is the "sentence" in this case to be measured against the constitutional yardstick.

The operating features of the California indeterminate sentence law are well known, and need only be summarized here. Under this system[3] the Legislature prescribes both the minimum and the maximum terms for each offense punishable by imprisonment in the state prison. Upon conviction of such an offense, and if neither a new trial nor probation is granted, the trial court does not specify the length of imprisonment but simply sentences the defendant for the term "prescribed by law." (Pen. Code, § 1168.) It is the Adult Authority, an administrative agency within the Department of Corrections (Pen. Code, §§ 5001, 5075-5082), which thereafter determines within statutory limits the length of the term the defendant will actually be required to serve. (Pen. Code, §§ 3020-3025.)

Three considerations impel us to the conclusion that a defendant under

[3]There are, of course, other kinds of indeterminate sentence laws. (See Note, *Statutory Structures for Sentencing Felons to Prison* (1960) 60 Colum.L.Rev. 1134, 1144-1152; *Sentencing Practices of Other States,* 22 Assem. Interim Com. Report No. 1, Criminal Procedure (1959-1961) pp. 78-79; Comment, *Indeterminate Sentence Laws—The Adolescence of Peno-Correctional Legislation* (1937) 50 Harv.L.Rev. 677, 678-683.)

an indeterminate sentence has in effect been sentenced to the maximum term provided by law, and that the constitutional validity of the sentence must be judged by that maximum.

First, the theory of the indeterminate sentence law in California is that it permits the *shortening* of a defendant's sentence upon a showing of rehabilitation. This has not always been the reason invoked elsewhere for indeterminate sentence laws. When they first came into use—in certain countries of continental Europe in the 18th and 19th centuries—their purpose was the contrary, i.e., to permit the *lengthening* of sentences for the preventive detention of dangerous unrehabilitated criminals who had served their original terms. By the middle of the 19th century, however, such laws had generally disappeared. And when the indeterminate sentence system was revived by American prison reformers in the latter part of the century, its purpose was wholly ameliorative. The goal of its proponents was to individualize the rehabilitation process, and to use the power to shorten sentences as an incentive to reformation. (Sellin, Indeterminate Sentence, in 4 Encyc. Soc. Sci. (1937) pp. 650-651.)

California firmly adheres to the latter theory, as this court announced shortly after our first indeterminate sentence law was enacted. (Stats. 1917, ch. 527, p. 665.) In the leading case of *In re Lee* (1918) 177 Cal. 690, 692 [171 P. 958], we undertook "to consider the nature and purposes of the indeterminate sentence law. It is generally recognized by the courts and by modern penologists that the purpose of the indeterminate sentence law, like other modern laws in relation to the administration of the criminal law, is *to mitigate the punishment which would otherwise be imposed upon the offender.* These laws place emphasis upon the reformation of the offender. They seek to make the punishment fit the criminal rather than the crime. They endeavor to put before the prisoner great incentive to well-doing in order that his will to do well should be strengthened and confirmed by the habit of well-doing." (Italics added.)[4]

The relevance of this theory to our present inquiry is clear: if the purpose of the indeterminate sentence law is thus to mitigate a punishment which "would otherwise be imposed," the greater punishment must itself be one which it is within the power of the Legislature to decree. Accordingly, it is the maximum term prescribed by the statute—not a lesser period there-

---

[4]That we adhere no less to this theory today is shown by the quotation of this language in our recent decision in *In re Minnis* (1972) 7 Cal.3d 639, 644 [102 Cal. Rptr. 749, 498 P.2d 997]. (See also *Briscoe* v. *Reader's Digest Association, Inc.* (1971) 4 Cal.3d 529, 539, fn. 12 [93 Cal.Rptr. 866, 483 P.2d 34]; *People* v. *Wade* (1968) *supra,* 266 Cal.App.2d 918, 928.)

after fixed as an "incentive to well-doing"—which must survive constitutional scrutiny.

Our second reason for reaching this conclusion is derived from the actual operation of the indeterminate sentence program: Penal Code section 3020 empowers the Adult Authority not only to "determine" the lesser term a defendant will be allowed to serve as an incentive to reformation, but also to "redetermine" that term when appropriate to do so. Pursuant to this power the Adult Authority may, for good cause (*In re McLain* (1960) 55 Cal.2d 78, 87 [9 Cal.Rptr. 824, 357 P.2d 1080]) and at any time prior to a defendant's final discharge, extend a previously fixed lesser term by re-fixing it at any period up to and including the statutory maximum. Stated otherwise, a defendant under an indeterminate sentence has "no vested right" to have his sentence fixed at the term first prescribed by the Adult Authority "or any other period less than the maximum sentence provided by statute." (*In re Cowen* (1946) 27 Cal.2d 637, 641 [166 P.2d 279].)[5] Viewed realistically, a defendant's liability is to serve the maximum term, and he is therefore entitled to know that the maximum in his case is lawful.

Our third basis for so concluding is found in the cases upholding the indeterminate sentence law against various constitutional challenges. It was early charged that the indeterminate sentence law violated the separation of powers clause by vesting either a legislative or judicial function—the fixing of terms—in an agency of the executive branch. We rejected this contention in *In re Lee* (1918) *supra,* 177 Cal. 690, 693, reasoning that "[T]he legislative function is filled by providing the sentence which is to be imposed by the judicial branch upon the determination of the guilt of the offender. This is done by the enactment of the indeterminate sentence law. The judicial branch of the government is intrusted with the function of determining the guilt of the individual and of imposing the sentence provided by law for the offense of which the individual has been found guilty. The actual carrying out of the sentence and the application of the various provisions for ameliorating the same are administrative in character and properly exercised by an administrative body."[6]

Manifestly, if the constitutionality of the indeterminate sentence law is

---

[5]The rule has been followed in a variety of contexts. (See, e.g., *In re Schoengarth* (1967) 66 Cal.2d 295, 302 [57 Cal.Rptr. 600, 425 P.2d 200]; *In re McLain* (1960) *supra,* 55 Cal.2d 78, 87; *In re Smith* (1949) 33 Cal.2d 797, 804 [205 P.2d 662]; *In re Byrnes* (1948) 32 Cal.2d 843, 850 [198 P.2d 685].)

[6]This reasoning has met the test of time. (See, e.g., *In re Sandel* (1966) 64 Cal.2d 412, 415 [50 Cal.Rptr. 462, 412 P.2d 806]; *In re Larsen* (1955) 44 Cal.2d 642, 647 [283 P.2d 1043]; *People* v. *Kostal* (1958) 159 Cal.App.2d 444, 451-453 [323 P.2d 1020].)

thus upheld by deeming that the "sentence" prescribed by the Legislature and imposed by the court is the term declared by the statute rather than later ameliorated by the administrative agency, that same sentence must also be measured against the constitutional test of cruel or unusual punishment.

In addition, it has often been asserted that an indeterminate sentence violates the due process clause because it is fatally uncertain. The claim has equally often been refuted with the explanation that, as we said in *Lee* (*id.* at p. 693), "the indeterminate sentence is in legal effect a sentence for the maximum term."[7] But, again, if an indeterminate sentence is thus a sentence for the maximum term "in legal effect," that maximum must in the first instance be constitutionally valid.

The interaction of the foregoing constitutional justifications for the indeterminate sentence law is well illustrated in *People* v. *Sama* (1922) 189 Cal. 153 [207 P. 893]. There the defendant was convicted of attempted robbery. The punishment for robbery was an indeterminate sentence of five years to life; the punishment for an attempt to commit any crime was imprisonment for up to one-half of the maximum term provided for the completed offense. The judgment purported to sentence the defendant "for the term prescribed by law" under the indeterminate sentence statutes. He appealed, contending that an indeterminate sentence is a sentence for the maximum term, and in fixing a term at less than maximum the prison board is simply exercising clemency; that the sentence in his case must therefore be deemed to be for a term of one-half of his life, a period that obviously cannot be calculated except with hindsight after his death, and hence is void for uncertainty. The Attorney General contended that under the indeterminate sentence law the defendant was first required to serve a definite minimum term of six months;[8] that it thereafter would be the duty of the prison board to fix the remainder of the defendant's term, so that at no time would his sentence be uncertain; and that the statement that an indeterminate sentence is a sentence for the maximum term "is but a theory."

The theory, nevertheless, proved dispositive. Quoting the above language from *Lee* (177 Cal. at p. 693), we reasoned (189 Cal. at pp. 156-157):

---

[7]This, too, is settled doctrine. (See, e.g., *In re Mills* (1961) 55 Cal.2d 646, 653 [12 Cal.Rptr. 483, 361 P.2d 15]; *In re Larsen* (1955) *supra,* 44 Cal.2d 642, 647: *People* v. *Wells* (1949) 33 Cal.2d 330, 335-337 [202 P.2d 53]; *In re Jordan* (1923) 190 Cal. 416 [212 P. 913].)

[8]A six-month minimum term was part of the indeterminate sentence law until 1963. (Stats. 1963. ch. 1702. p. 3344.)

"This being the settled law, it follows that the sentence imposed in the case at bar is one for the maximum term prescribed by law, which, as already indicated, would be for one-half of appellant's life. It also follows from *In re Lee, supra,* that the function which the state board of prison directors would perform in determining what term of years appellant must serve is no part of the actual fixing of the sentence itself; and that if it were so regarded it would be the exercise of a judicial function by an executive board, and void under section 1, article III, of the constitution. The legislature has no authority to vest this judicial power in the state board of prison directors, and in so far as section 1168 of the Penal Code purports to do so it is in violation of that section. Hence, *in determining whether or not this sentence is valid, the test is the term of imprisonment called for by the judgment*—one-half, of appellant's life—and *not* the term of years which would be fixed by the state board of prison directors at the expiration of the minimum term." (Italics added.) We held that maximum term to be void for uncertainty and remanded the defendant for resentencing.

For each of the above reasons we conclude that when a defendant under an indeterminate sentence challenges that sentence as cruel or unusual punishment in violation of the California Constitution, the test is whether the maximum term of imprisonment permitted by the statute punishing his offense exceeds the constitutional limit, regardless of whether a lesser term may be fixed in his particular case by the Adult Authority.[9]

Applying this test to the proceeding before us, we see that for second-offense indecent exposure section 314 prescribes a punishment of imprisonment in the state prison for "not less than one year." (Fn. 2, *ante.*) In confirmation of the unmistakable meaning of that phrase, Penal Code section 671 provides that "Whenever any person is declared punishable for a crime by imprisonment in the state prison for a term not less than any specified number of years, and no limit to the duration of such imprisonment is declared, punishment of such offender shall be imprisonment during his natural life," subject to the provisions of the indeterminate sentence law. For present purposes, therefore, we deem this petitioner to be serving a sentence of life imprisonment.[10]

---

[9]This is the rule to be applied when the *minimum* term prescribed by the statute does not violate the cruel or unusual punishment clause. If an analysis such as we undertake herein demonstrates that the minimum term does violate that clause, the defendant will be entitled to relief without regard to the constitutionality vel non of the maximum. (See, e.g., *Weems* v. *United States* (1910) *supra,* 217 U.S. 349, and *People* v. *Lorentzen* (1972) 387 Mich. 167 [194 N.W.2d 827]; cf. *People* v. *Clark* (1970) 3 Cal.3d 97 [89 Cal.Rptr. 253, 473 P.2d 997].)

[10]For certain other purposes, however, an indeterminate sentence with a life maximum should not be treated as the equivalent of a sentence of life imprisonment.

## II

The particular constitutional limit said to be exceeded in the case at bar must now be delineated. Petitioner expressly disavows any claim that indecent exposure is a "status" offense which cannot be criminally punished. (*Robinson* v. *California* (1962) 370 U.S. 660 [8 L.Ed.2d 758, 82 S.Ct. 1417].) Nor is there any contention that a sentence of life imprisonment is, in the abstract, a cruel or unusual *method* of punishment. (*In re Rosencrantz* (1928) 205 Cal. 534, 537 [271 P. 902].) Petitioner urges, rather, that a life sentence *for indecent exposure* is cruel or unusual punishment under the California Constitution because it is grossly disproportionate to the offense.

No California court has yet held a statutory penalty unconstitutional on the ground it is disproportionate to the crime committed. The rule has been recognized, however, in several opinions considering the constitutionality of the death penalty. Thus in *In re Finley* (1905) 1 Cal.App. 198, 202 [81 P. 1041], the court stated that a punishment may be denounced as unusual in the constitutional sense only when it "is out of all proportion to the offense, and is beyond question an extraordinary penalty for a crime of ordinary gravity committed under ordinary cricumstances" (italics omitted). In *People* v. *Oppenheimer* (1909) 156 Cal. 733, 737 [106 P. 74], the court reasoned that the infliction of the death penalty by ordinary methods is not cruel or unusual punishment "unless perhaps it be so disproportionate to the offense for which it is inflicted as to meet the disapproval and condemnation of the conscience and reason of men generally, 'as to shock the moral sense of the people.' " And in *People* v. *Anderson* (1972) *supra,* 6 Cal.3d 628, we recognized that "punishment of excessive severity for ordinary offenses" may be both cruel (*id.* at p. 646) and unusual (*id.* at p. 654) within the meaning of article I, section 6, of the California Constitution.

A similar rule has evolved at the federal level in the interpretation of the cruel and unusual punishment clause of the Eighth Amendment. In *O'Neil* v. *Vermont* (1892) 144 U.S. 323 [36 L.Ed. 450, 12 S.Ct. 693], the defendant was convicted on multiple counts of unauthorized sale of liquor and sentenced to a fine of over $6,000 or, if he could not pay the fine, to hard labor for more than 54 years. A majority of the United

---

(See, e.g., *In re Quinn* (1945) 25 Cal.2d 799 [154 P.2d 875] (power of trial court to order consecutive sentences): *People* v. *Ralph* (1944) 24 Cal.2d 575 [150 P.2d 401] (eligibility for commitment to Youth Authority): *People* v. *Shaw* (1965) 237 Cal.App.2d 606, 612-616 [47 Cal.Rptr. 96], and cases cited (right to additional peremptory challenges)).

States Supreme Court declined on federal-state grounds to consider whether this sentence constituted cruel and unusual punishment. Dissenting, Justice Field would have held the sentence to be "one which, in its severity, considering the offences of which [the defendant] was convicted, may justly be termed both unusual and cruel." *(Id.* at p. 339 [36 L.Ed. at p. 458].) He recognized that the cruel and unusual punishment clause was traditionally thought to prohibit physically torturous methods of punishment such as the rack and the screw, but explained: "The inhibition is directed, not only against punishments of the character mentioned, but against all punishments which by their excessive length or severity are greatly disproportioned to the offences charged. The whole inhibition is against that which is excessive either in the bail required, or fine imposed, or punishment inflicted." *(Id.* at pp. 339-340 [36 L.Ed. at p. 458].)

Less than two decades later Justice Field's view became law in the landmark case of *Weems* v. *United States* (1910) *supra,* 217 U.S. 349. There a disbursing officer in a Philippine government bureau was convicted of making two false entries in his cash books. He was sentenced under a Philippine statute prescribing a minimum of 12 years' imprisonment for this crime, to be served in chains and at "hard and painful" labor, together with a fine, loss of numerous civil rights, and perpetual surveillance. The United States Supreme Court measured the statute against the cruel and unusual punishment clause of the Philippine Bill of Rights, which the court deemed to have the same meaning as the Eighth Amendment. Although undoubtedly influenced by the peculiar penalties imposed in addition to imprisonment, the court did not hold the law unconstitutional merely on the ground of the bizarre method of the punishment. Rather, the court quoted both the foregoing language of Justice Field in *O'Neil* and an early Massachusetts case in which it was acknowledged that " 'imprisonment in the State prison for a long term of years might be so disproportionate to the offense as to constitute a cruel and unusual punishment.' " *(Id.* at p. 368 [54 L.Ed. at p. 799].)

Reviewing in this light the minimum sentence permissible under the statute, the court observed that "Such penalties for such offenses amaze those who have formed their conception of the relation of a state to even its offending citizens from the practice of the American commonwealths, and believe that it is a precept of justice that punishment for crime should be graduated and proportioned to offense." *(Id.* at pp. 366-367 [54 L.Ed. at p. 798].) The court concluded by invalidating the statute on the twofold ground that "It is cruel in its excess of imprisonment and that which accompanies and follows imprisonment. It is unusual in its character. Its

punishments come under the condemnation of the bill of rights, both on account of their degree and kind." (*Id.* at p. 377 [54 L.Ed. at p. 802].)[11]

The principle was recently reaffirmed in *Furman* v. *Georgia* (1972) *supra,* 408 U.S. 238, the United States Supreme Court decision holding the death penalty unconstitutional as applied. In the course of his separate opinion in support of the majority, Justice Brennan gave as his view that "Although the determination that a severe punishment is excessive may be grounded in a judgment that it is disproportionate to the crime, the more significant basis is that the punishment serves no penal purpose more effectively than a less severe punishment." (Fn. omitted; *id.* at p. 280 [33 L.Ed.2d at pp. 372-373].) In turn, Justice Marshall recognized that "a penalty may be cruel and unusual because it is excessive and serves no valid legislative purpose. [Citation.] The decisions [of the United States Supreme Court] are replete with assertions that one of the primary functions of the cruel and unusual punishments clause is to prevent excessive or unnecessary penalties [citations]; these punishments are unconstitutional even though popular sentiment may favor them." (*Id.* at p. 331 [33 L.Ed.2d at p. 402].)

Although two of the three petitioners in *Furman* were under sentence of death for rape rather than murder, the majority opinions of the high court did not address themselves to the question whether that sentence was unconstitutional because disproportionate to the crime. (Cf. *Rudolph* v. *Alabama* (1963) 375 U.S. 889 [11 L.Ed.2d 119, 84 S.Ct. 155] (Goldberg, J., joined by Douglas, J., and Brennan, J., dissenting from denial of certiorari).) The Fourth Circuit Court of Appeals, however, so ruled in *Ralph* v. *Warden* (4th Cir. 1970) 438 F.2d 786, certiorari denied (1972) 408 U.S. 942 [33 L.Ed.2d 766, 92 S.Ct. 2869]. There the defendant was sentenced to death under Maryland law for the crime of rape. Relying on the United States Supreme Court cases discussed herein, the federal court held (at p. 793) that a death sentence for the crime of rape without aggravating circumstances is so disproportionate as to offend the Eighth Amendment.

Finally, the highest courts of our sister states have repeatedly invoked

---

[11]In *Trop* v. *Dulles* (1958) *supra,* 356 U.S. 86, the court invalidated the penalty of loss of citizenship for wartime desertion, making it clear that a method of punishment may violate the Eighth Amendment even though it results in no physical torture. (*Id.* at p. 101 [2 L.Ed.2d at pp. 642-643], plurality opinion of Warren, C. J.) Although excessiveness was not there in issue (*id.* at p. 99 [2 L.Ed.2d at p. 641]), the principle of proportionality was recognized in the statement that "Fines, imprisonment or even execution may be imposed *depending upon the enormity of the crime*" (italics added; *id.* at p. 100 [2 L.Ed.2d at p. 642]).

the rule of proportionality in applying their equivalents of our cruel or unusual punishment clause.[12] Thus in *Workman* v. *Commonwealth* (Ky. 1968) 429 S.W.2d 374 [33 A.L.R.3d 326], a sentence of life imprisonment without possibility of parole for rape committed by juvenile defendants was held to be unconstitutionally disproportionate to the offense. In *Cannon* v. *Gladden* (1955) 203 Ore. 629 [281 P.2d 233], a sentence of life imprisonment for assault with intent to commit rape was voided on this ground. In *State* v. *Evans* (1952) 73 Idaho 50 [245 P.2d 788], it was held in effect that life imprisonment for lewd and lascivious acts upon a child would be so excessive as to constitute cruel and unusual punishment. In *Dembowski* v. *State* (1968) 251 Ind. 250 [240 N.E.2d 815], a 25-year maximum indeterminate sentence for robbery was ruled unconstitutionally disproportionate to a lesser punishment for armed robbery. In *State* v. *Kimbrough* (1948) 212 S.C. 348 [46 S.E.2d 273], a sentence of 30 years at hard labor for burglary was held excessive. In *People* v. *Lorentzen* (1972) *supra,* 194 N.W.2d 827, a mandatory minimum sentence of 20 years for selling marijuana was held so severe as to violate the cruel or unusual punishment clause.[13]

 Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible.

[12] In certain states, it is true, the constitutional provision expressly directs that every penalty be proportioned to the offense. (See *People* v. *Anderson* (1972) *supra,* 6 Cal.3d 628, 636, fns. 15 and 16; *Green* v. *State* (Alaska 1964) 390 P.2d 433, 435, fn. 11.) But the jurisdictions applying the rule are not limited to these few states.

[13] Nor is disproportionality confined to long prison sentences: in *State* v. *Ward* (1970) 57 N.J. 75 [270 A.2d 1], a punishment of two to three years' imprisonment for possession of marijuana was held excessive when inflicted on youthful first offenders, and in *State* v. *Driver* (1878) 78 N.C. 423, a sentence of five years in county jail for wife-beating was ruled unconstitutionally disproportionate. There have also been cases, like *O'Neil,* in which a defendant convicted of multiple identical petty offenses was given a cumulative sentence on all the counts far in excess of the maximum permissible for any one offense, and the total was held invalid. (See, e.g., *Faulkner* v. *State* (Alaska 1968) 445 P.2d 815 (sentence of 36 years on 8 bad check counts); *Kenimer* v. *State* (1950) 81 Ga.App. 437 [59 S.E.2d 296] (fine of $11,900 or 1,190 days (i.e., over 3 years) for 238 consecutive counts of contempt for violating the child custody provisions of a divorce decree); *Kenimer* v. *State* (1950) 83 Ga. App. 264 [63 S.E.2d 280] (sentence for the same offenses of $4,760 or 476 days); *State* v. *Ross* (1910) 55 Ore. 450 [104 P. 596, 106 P. 1022] (embezzlement of $288,426 punished by a fine of double that amount or imprisonment in county jail for 288,426 days (i.e., 790 years); *State* ex rel. *Garvey* v. *Whitaker* (1896) 48 La.Ann. 527 [19 So. 457] (fine of $720 or 2,160 days (i.e., nearly 6 years) for 72 violations of an ordinance prohibiting destruction of plants in a public square).)

The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty "out of all proportion to the offense" (*Robinson* v. *California* (1962) *supra,* 370 U.S. 660, 676 [8 L.Ed.2d 758, 768] (concurring opinion of Douglas, J.); *In re Finley* (1905) *supra,* 1 Cal.App. 198, 202), i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment.

The courts have attempted to formulate a general description of that constitutional limit. *Workman,* for example, would strike down a punishment "so disproportionate to the offense committed as to shock the moral sense of the community." (429 S.W.2d at p. 377.) *Cannon* invalidates a penalty so disproportionate "as to shock the moral sense of all reasonable men as to what is right and proper." (281 P.2d at p. 235.) *Evans* would hold unconstitutional a punishment so disproportionate "as to shock the conscience of reasonable men." (245 P.2d at p. 792.) *Lorentzen* quotes an earlier Michigan case for the rule annulling a punishment so disproportionate "as to shock the moral sense of the public." (194 N.W.2d at p. 831.) And *Faulkner* would void a penalty so disproportionate "as to be completely arbitrary and shocking to the sense of justice." (445 P.2d at p. 819.)

With slight variation, this is the rhetoric we used in our *Oppenheimer* opinion, quoted above.[14] However, the precise expression is not significant. It is essential only that in its actual operation the rule ensure that the power to prescribe penalties " 'be exercised within the limits of civilized standards.' " (*People* v. *Anderson* (1972) *supra,* 6 Cal.3d 628, 640, quoting from *Trop* v. *Dulles* (1958) *supra,* 356 U.S. 86, 100 [2 L.Ed.2d 630, 642] (plurality opinion of Warren, C. J.); Mosk, *The Eighth Amendment Rediscovered* (1968) 1 Loyola L.A.L.Rev. 4, 22.) "The State, even as it punishes, must treat its members with respect for their intrinsic worth as human beings." (*Furman* v. *Georgia* (1972) *supra,* 408 U.S. 238, 270 [33 L.Ed.2d 346, 367] (opinion of Brennan, J.).) Punishment which is so excessive as to transgress those limits and deny that worth cannot be tolerated.

 We conclude that in California a punishment may violate article I, section 6, of the Constitution if, although not cruel or unusual in its method, it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity.[15]

---

[14]". . . so disproportionate . . . as to meet the disapproval and condemnation of the conscience and reason of men generally, 'as to shock the moral sense of the people.' " (156 Cal. at p. 737.)

[15]A dictum arguably to the contrary in *In re Garner* (1918) 179 Cal. 409, 415 [177 P. 162], based on an 1860 case, is disapproved.

## III

To aid in administering this rule, we point to certain techniques used in the decisions discussed herein. First, a number of courts have examined the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society. Thus in *Anderson* we spoke in this connection of excessive punishment for "ordinary offenses" (6 Cal.3d at p. 646), and in *Finley* the court referred to an extraordinary penalty for "a crime of ordinary gravity committed under ordinary circumstances" (italics omitted; 1 Cal.App. at p. 202).

More specifically, in his dissenting opinion in *O'Neil* Justice Field relied on the facts of the crime in question to demonstrate its triviality: there, a New York liquor dealer was convicted in Vermont of selling liquor to residents of Vermont, a "dry" state. Justice Field stressed that such sales were legal under the law of New York (144 U.S. at p. 337 [36 L.Ed. at p. 457]), and that the defendant's sole connection with Vermont was to send individual jugs of liquor, one every three or four days, by common carrier, to persons in Vermont who had ordered them and would pay upon delivery. (*Id.* at pp. 337-341 [36 L.Ed. at pp. 457-459].) In *Weems* the court also emphasized the minor nature of the offense before it: the opinion twice notes that the amount of cash which the defendant was convicted of falsely claiming as a government expenditure was only a few hundred pesos (217 U.S. at pp. 358, 366 [54 L.Ed. 795, 798]), and twice underscores that an offender may "gain nothing" from this crime and "injure nobody" (*id.* at p. 365 [54 L.Ed. at p. 797]).

Also relevant to the question of proportionality is the nonviolent nature of the offense. Thus the court in *Lorentzen* took note of the fact that sale of marijuana is a nonviolent crime and that the defendant was 23 years old, living with his parents, employed at General Motors, and had no prior criminal convictions. (194 N.W.2d at p. 828.) Adding these elements together, the court held (at p. 834) that "A compulsory prison sentence of 20 years for a non-violent crime imposed without consideration for defendant's individual personality and history is so excessive that it 'shocks the conscience.'" (Accord, *People* v. *Sinclair* (1972) 387 Mich. 91 [194 N.W.2d 878, 905-906] (concurring opinion of T. G. Kavanagh, J. and Adams, J.).) Likewise, the court in *Ward* (270 A.2d at pp. 4-5) stressed that the charged marijuana possession was for the defendant's own use and that he was both young and a first offender. On the other hand, if the offense is deemed of minimal danger to society the penalty may be disproportionate even though the defendant is neither young nor a first offender: in striking down a 36-year sentence imposed on a 46-year-old man with a prior criminal record for "a single spree of passing bad checks which,

according to the indictment, took place in a single day," the *Faulkner* court explained that "the offense is not of sufficient gravity to justify imposing what amounts to a life sentence on appellant." (445 P.2d at pp. 818-819.)

Nor, finally, is nonviolence or absence of a victim a prerequisite to a finding of disproportionality. In appropriate cases the courts have nevertheless held the punishment excessive on the ground that no aggravating circumstances were shown. Thus in *Ralph* it was obviously impossible to contend that the crime committed—forcible rape—was nonviolent or "injured nobody." The court conceded that " 'There is a sense in which life is always endangered by sexual attack' " (438 F.2d at p. 788, quoting from Packer, *Making the Punishment Fit the Crime* (1964) 77 Harv.L.Rev. 1071, 1077). The court explained, "We use the term, however, in another sense—that there are rational gradations of culpability that can be made on the basis of injury to the victim." The court concluded that imposition of the death penalty on "a rapist whose act is not marked with the great aggravation that often accompanies this crime" is arbitrary, and that the penalty is unconstitutionally disproportionate to the offense in all cases in which "the victim's life is neither taken nor endangered. . . ." (438 F.2d at p. 793.) In another rape case, the *Workman* court emphasized the youth of the defendants in holding that life imprisonment without parole "shocks the general conscience of society today and is intolerable to fundamental fairness." (429 S.W.2d at p. 378.)

The second technique used by the courts is to compare the challenged penalty with the punishments prescribed in the *same jurisdiction* for *different offenses* which, by the same test, must be deemed more serious. The underlying but unstated assumption appears to be that although ·isolated excessive penalties may occasionally be enacted, e.g., through "honest zeal" (*Weems* v. *United States* (1910) *supra*, 217 U.S. 349, 373 [54 L.Ed. 793, 801]) generated in response to transitory public emotion, the Legislature may be depended upon to act with due and deliberate regard for constitutional restraints in prescribing the vast majority of punishments set forth in our statutes. The latter may therefore be deemed illustrative of constitutionally permissible degrees of severity; and if among them are found more serious crimes punished less severely than the offense in question, the challenged penalty is to that extent suspect.

The opinions are replete with examples of this technique. Thus in his dissent in *O'Neil* Justice Field measured the penalty for multiple liquor sales against those inflicted for undeniably more serious crimes under Vermont

law: "Had [the defendant] been found guilty of burglary or highway robbery, he would have received less punishment than for the offences of which he was convicted. It was six times as great as any court in Vermont could have imposed for manslaughter, forgery or perjury." (144 U.S. at p. 339 [36 L.Ed. at p. 458].)

In *Weems* the court illustrated the excessiveness of the penalties for falsifying a public document by listing a variety of more serious federal crimes, including certain degrees of homicide, that were not punished so severely. (217 U.S. at p. 380 [54 L.Ed. at pp. 803-804].) Refining its analysis, the court also examined the punishment for an offense of the same general nature as that charged—forgery or counterfeiting of obligations or securities of the United States or Philippine governments—and found that "the highest punishment possible for a crime which may cause the loss of many thousand of dollars, and to prevent which the duty of the State should be as eager as to prevent the perversion of truth in a public document, is not greater than that which may be imposed for, falsifying a single item of a public account." (*Id.* at p. 381 [54 L.Ed. at p. 804].) Great weight was given to these disparities in the holding of unconstitutionality.[16]

Closely related to the foregoing is the third technique used in this inquiry, i.e., a comparison of the challenged penalty with the punishments prescribed for the *same offense* in *other jurisdictions* having an identical or similar constitutional provision. Here the assumption is that the vast majority of those jurisdictions will have prescribed punishments for this offense that are within the constitutional limit of severity; and if the challenged penalty is found to exceed the punishments decreed for the offense in a significant number of those jurisdictions, the disparity is a further measure of its excessiveness.

Again examples abound. In *Weems* the court observed that the punishment prescribed by the Philippine statute "has no fellow in American legislation." (217 U.S. at p. 377 [54 L.Ed. at p. 802].) The court did find a

---

[16]In *Lorentzen* the court compared the penalty for sale of marijuana with the maximum punishments under Michigan law for five crimes similarly involving the "sale of harmful substances to others" (194 N.W.2d at p. 831), and to the maximum punishments for no less than 14 crimes involving "harm to people," including such offenses as manslaughter, aggravated assaults, rape, kidnaping, cruelty to children, and vehicle homicide (*id.* at pp. 831-832); in *Cannon* the court compared the penalty for assault with intent to commit rape to the lesser punishment for rape itself (281 P.2d at p. 235); in *Evans* the court noted that the punishment for lewd and lascivious acts upon a child was much greater than for forcible rape (245 P.2d at p. 793); in *Dembowski* the court measured the sentence for simple robbery against a lesser penalty for armed robbery (240 N.E.2d at pp. 816-818); and in *Driver* the court emphasized that a sentence of five years for wife-beating was cruel and unusual because it was "greater than has ever been prescribed or known or inflicted" (78 N.C. at p. 426).

similar offense in the federal criminal code—false and excessive claim of payment of a sum appropriated by Congress—but stressed that the relatively light punishment for that crime "is in great contrast" to the heavy penalties inflicted on Weems. (*Id.* at p. 380 [54 L.Ed. at p. 804].)

In *Trop* the court compared the federal penalty of loss of citizenship for desertion in wartime with the legislation of other countries on this topic, and found that "The civilized nations of the world are in virtual unanimity that statelessness is not to be imposed as punishment for crime." (356 U.S. at p. 102 [2 L.Ed.2d at p. 643].) More particularly, the court observed that "The United Nations' survey of the nationality laws of 84 nations of the world reveals that only two countries, the Philippines and Turkey, impose denationalization as a penalty for desertion. In this country the Eighth Amendment forbids this to be done." (Fn. omitted; *id.* at p. 103 [2 L.Ed.2d at pp. 643-644].)

In *Lorentzen* the court explained that "The decency test, of necessity, looks to comparative law for guidelines in determining what penalties are widely regarded as proper for the offense in question." (194 N.W.2d at p. 832.) The court then examined the laws of other states on the topic of sale of marijuana, and found that 26 have no minimum sentence at all for that offense, 22 provide a shorter minimum than Michigan, and only one imposes as severe a minimum term as that state. (*Ibid.*) In *Evans* the court listed the statutory penalties of 27 states for lewd and lascivious acts upon a child and stressed that "Except for California, none allows a greater maximum than twenty years," in contrast to the life term apparently provided by Idaho law. (245 P.2d at pp. 792-793, & fn. 1.)

In *Ralph* the court looked to a variety of sources in assessing the proportionality of the penalty of death for rape. Thus the court observed that "Congressional action in recently repealing the death penalty for rape in the District of Columbia follows a worldwide trend. Presently the United States is one of only four nations in which rape is punishable by death, and in this country 34 states punish rape only by imprisonment. In none of the 16 remaining states is death mandatory, but it is retained as a sentencing alternate. It appears, therefore, that the overwhelming majority of the nations of the world, legislatures of more than two-thirds of the states of the union, and Congress, as evidenced by its amendment of the District of Columbia Code, now considered the death penalty to be an excessive punishment for the crime of rape." (Fns. omitted; 438 F.2d 786, 791-792.)

The court also gave weight to the views of the draftsmen of respected model legislation, noting that repeal of the death penalty for rape has been recommended in both the proposed Federal Criminal Code of the National

Commission on Reform of Federal Criminal Laws and the Model Penal Code of the American Law Institute. (*Id.* at p. 791.)

## IV

■ There is ample authority, then, for applying the foregoing analyses to our inquiry into whether the life sentence prescribed by section 314 inflicts a penalty so disproportionate to the crime as to violate the cruel or unusual punishment clause of the California Constitution. We begin by examining the seriousness of the offense of indecent exposure.

## A

At common law indecent exposure was deemed to be no more than a public nuisance, and was punished as a misdemeanor. (Archbold, Criminal Pleading, Evidence and Practice (37th ed. 1969) pp. 1241-1242; 2 Wharton's Criminal Law (12th ed. 1932) pp. 2048-2051; see cases collected in Note, *Criminal Offense Predicated Upon Indecent Exposure,* 93 A.L.R. 996, 997-1001.) The penalties were generally a fine or a brief jail sentence.

The common law offense was subjected to statutory regulation in the Vagrancy Act of 1824. (5 Geo. 4, ch. 83.) Under section 4 of that act every person guilty of indecent exposure was deemed "a rogue and a vagabond," but could be sentenced to jail for not more than three months. Under sections 5 and 10 of the act a person guilty of indecent exposure with a prior conviction of the same offense was deemed "an incorrigible rogue," but could be sentenced to jail for not more than one year. Subsequently, the offense of indecent exposure in the streets was declared punishable under the Town Police Causes Act of 1847 (10 & 11 Vict., ch. 89, § 28), but the punishment was a fine of not more than 40 shillings or a jail sentence of not more than 14 days.[17]

In California a similar pattern prevailed until the present penalty was added in 1952. (Stats. 1953, First Ex. Sess. 1952, ch. 23, § 4, p. 381.) Indeed, there was no statute whatever proscribing indecent exposure until the enactment of the Penal Code of 1872. At that time the offense was declared to be a misdemeanor, and there was no increased penalty for subsequent convictions. It was therefore punishable in all cases by a maximum of six months in jail and/or a fine of $500. (Fn. 1, *ante.*) This was the law of our state for 80 years.

The low-key approach of the common law is also that adopted by modern

---

[17]Indecent exposure in England is still punished under these two statutes. (Archbold, *op. cit. supra,* at p. 1242.)

psychiatric science. Clinical studies "support and confirm the traditional legal provisions which have treated this behaviour as a social nuisance, as disorderly conduct rather than an offence causing personal injury." (Gigeroff, Mohr, and Turner, *Sex Offenders on Probation: The Exhibitionist* (1968) 32 Fed. Prob. (No. 3) 17, 21 [hereinafter referred to as Gigeroff].) This is so because the commission of the offense invariably entails no physical aggression or even contact: "It is generally agreed that the person exposing seeks some reaction from the person exposed to, although exactly what reaction is not clear. The exposure occurs at inappropriate times and places and would seem to be calculated to *surprise* the female. It is doubtful that the reaction sought is one of pleasure and in many cases it seems to be intended to evoke fear and shock. It is generally agreed that the exhibitionist does not seek further contact with the victim; on the contrary, he is afraid of it. There is usually some appreciable distance which separates the exhibitionist and the object and rarely does it occur when the parties are in close proximity." (Gigeroff, at p. 19.)

Turning to the typical offender, we find a similar pattern of nonviolence. "The vast majority of exhibitionists are relatively harmless offenders; mostly they are public nuisances and sources of embarrassments" (Report of Karl M. Bowman, Medical Superintendent of the Langley Porter Clinic, in 2 Assem.J. (1951 Reg.Sess.) p. 2847 [hereinafter referred to as Bowman]).[18] They are characterized as "generally passive, inoffensive people" with low self-esteem.[19] Contrary to common public misconception, "Exhibitionists as a group are young, their age ranging from adolescence to the midthirties with the peak number of charges falling about the age of 25. . . . The onset of symptoms occurs at two peak periods, midpuberty and the early twenties. The first is associated with a period when the person is attempting to establish an identity, to free himself from a mother who has endangered his masculinity. The second occurs at a time of courtship and early marriage when, although he is attracted and bound to a female, he nevertheless experiences this as threatening and frustrating. Personality and background factors consistently show an insecurity in social relations. . . ." (Gigeroff, at pp. 19-20.) Acts of self-exposure, accordingly, are often "triggered by small frustrations" in the home, on the job, or in managing social relationships, particularly "around the time of serious courtship and engagement, marriage

---

[18]This report was prepared in connection with a sex crimes study authorized by the Legislature in 1949. It was included by the Assembly Interim Committee on Judicial System and Judicial Process in its Progress Report to the Legislature, April 11, 1951. (2 Assem.J. (1951 Reg.Sess.) p. 2701.)

[19]Affidavit of T. L. Clanon, M.D., assistant superintendent in charge of psychiatric services at the California Medical Facility.

and early marital adjustment, the pregnancy of the wife, and the arrival of a child." (*Id.* at pp. 20-21.)

Finally, although indecent exposure is not a "victimless" crime, any harm it may cause appears to be minimal at most. As noted above, the nonviolence of the conduct ensures there is no danger of physical injury to the person who witnesses the exposure. Nor is there any convincing evidence that the person is likely to suffer either long-term or significant psychological damage. (See Mohr, Turner, and Jerry, Pedophilia and Exhibitionism (1964), p. 121.) Indeed, the statute itself defines the offense as exposure in public or in any place where there are persons present who may merely be "offended or annoyed" thereby. (Fn. 2, *ante.*) Such an "annoyance" is not a sufficiently grave danger to society to warrant the heavy punishment of a life-maximum sentence.

## B

These considerations make a persuasive case for a finding of unconstitutional disproportionality between the offense and the aggravated penalty prescribed by section 314. The case is further strengthened by a comparison of this penalty with the punishments for other crimes in California which are undeniably of far greater seriousness. For example, is it rational to believe that second-offense indecent exposure is a more dangerous crime than the unlawful *killing* of a human being without malice but in the heat of passion? Yet the punishment for manslaughter (Pen. Code, § 193; up to 15 years) is far less than the life maximum inflicted by section 314. The same is true for such other violent crimes against the person as assault with intent to commit murder (Pen. Code, § 217; 1-14 years), kidnaping (Pen. Code, § 208; 1-25 years), mayhem (Pen. Code, § 204; up to 14 years), assault with intent to commit mayhem or robbery (Pen. Code, § 220; 1-20 years), assault with caustic chemicals, with intent to injure or disfigure (Pen. Code, § 244; 1-14 years), and assault on a peace officer or fireman engaged in the performance of his duties (Pen. Code, § 241; up to 2 years, or up to 1 year in jail; see also Pen. Code, § 243).

Turning to crimes which, although somewhat more indirect, remain extremely dangerous to life and limb, we note that the penalty for second-offense indecent exposure is also far greater than that imposed for arson (Pen. Code, § 447a; 2-20 years), burglary by torch or explosives (Pen. Code, § 464; 10-40 years), wrecking a vehicle of a common carrier, causing bodily harm (Pen. Code, § 219.1; 1-14 years), shooting at an inhabited dwelling (Pen. Code, § 246; 1-5 years, or up to 1 year in jail), poisoning food or drink with the intent to injure a human being (Pen. Code, § 347; 1-10 years), and

drunk driving causing bodily injury (Pen. Code, § 367e and Veh. Code, § 23101; up to 5 years, or up to 1 year in jail).

Nor does proportionality appear if we consider only the laws regulating sexual activities. Rather, we observe that the punishment for second-offense indecent exposure is far greater than that prescribed for such antisocial conduct as assault with intent to commit rape or sodomy (Pen. Code, § 220; 1-20 years), forcible abduction for purposes of defilement (Pen. Code, § 265; 2-14 years) or of prostitution (Pen. Code, § 266a; up to 5 years and/or fine up to $1,000), purchasing or selling a woman for prostitution (Pen. Code, §§ 266e and 266f; up to 5 years), and statutory rape (Pen. Code, § 264; up to 50 years, or up to 1 year in jail).

Lastly we may look to the statutes designed to protect children, as section 314 is often defended on that ground. Is it conceivable that indecent exposure twice repeated is a greater danger than the act of one who wilfully inflicts "unjustifiable physical pain" on a child "under circumstances or conditions likely to produce great bodily harm or death"? Or who wilfully inflicts on a child "any cruel or inhuman corporal punishment or injury resulting in a traumatic condition"? Yet the penalty for either of such brutalities (Pen. Code, §§ 273a and 273d; up to 10 years, or up to 1 year in jail) is far less than the life maximum imposed by section 314. And if a major purpose of section 314 is to guard children against assaults upon their sensibilities, what possible justification is there for the great disparity between petitioner's punishment and the simple misdemeanor penalties attached by Penal Code section 273g to the conduct of one who "in the presence of any child indulges in any degrading, lewd, immoral or vicious habits or practices"?[20]

We recognize, of course, that an important additional element must be taken into account: section 314 prescribes a life-maximum sentence for indecent exposure only when the offender has previously been convicted of the same crime or of lewd and lascivious acts upon a child (Pen. Code, § 288). We further recognize that the potential for recidivism is here very real: "exhibitionists are more likely to repeat their offence than other kinds of sex offenders." (Gigeroff, at p. 21; accord, Bowman, at p. 2847.) But this likelihood does not result in a *pro tanto* repeal of the cruel or unusual punishment clause. Petitioner does not challenge—nor do we consider—the valid-

[20]We need not emphasize that the life-maximum sentence imposed by section 314 is also greatly in excess of the penalties for such serious crimes against property as grand theft (Pen. Code, § 489; up to 10 years, or up to 1 year in jail), forgery (Pen. Code, § 473; 1-14 years, or up to 1 year in jail), and embezzlement (Pen. Code, § 514; 1-10 years), or such grave offenses against governmental integrity as bribery of an executive officer, a member of the Legislature, a judge, or a juror (Pen. Code, §§ 67, 85, and 92; 1-10 years or 1-14 years).

ity of our general habitual criminal law (Pen. Code, § 644) or of any other recidivist statute. He is entitled, however, to question whether in the particular context of indecent exposure the phenomenon of recidivism constitutionally justifies the greatly enhanced punishment of section 314. We hold that it does not.

At the outset we may put aside the Attorney General's suggestion that "in quite a number of such offenders the exhibitionism is only a facet of sexual problems which may manifest themselves in more aggressive acts." This risk appears to be mere fantasy. "Although individual cases have been cited to show that a person convicted of exposing has gone on to commit more serious violent crimes, this is not borne out in our followup studies and these reports are consequently regarded as strongly atypical and rare occurrences. The exhibitionist who commits a further offence is much more likely to repeat the same offence than any other kind. . . ." (Gigeroff, at p. 21.) Other well known experts in the field concur: Guttmacher and Weihofen describe as a "widely held misconception" the belief that "sex offenders regularly progress from minor offenses such as exhibitionism to major offenses like forced rape. Such a gradation is almost unknown." (Guttmacher and Weihofen, *Sex Offenses* (1952) 43 J.Crim.L.C. & P.S. 153, 154.) Bowman is equally forceful: "It should be stated explicitly that persons convicted of serious sex crimes do not commonly begin with voyeurism and exhibitionism and work up to crimes of violence and murder." (Bowman, at p. 2847.)

The Attorney General next contends that the long prison sentence provided by section 314 is "effective" because a substantial proportion of those guilty of indecent exposure "come from a higher socio-economic group than the normal criminal offender" and therefore "are inhibited from further acts because incarceration is more repugnant to those persons." There are two principal flaws in this argument. First, we reject in any event its elitist conclusion. Liberty is not sweeter to the rich than to the poor. Second, there is no compelling evidence of the validity of the premise. Persons from all walks of life are subject to the pressures and frustrations which can trigger exhibitionism. It is not the private preserve of the successful. Indeed, clinical studies of exhibitionists have shown that "despite an essentially normal intelligence distribution, school achievement is generally lower; in work situations, although generally hard working and conscientious, their low frustration tolerance and sensitivity to criticism leads to difficulties." (Gigeroff, at p. 20.)

The Attorney General also asserts that "the group therapy available in correctional institutions can have a salutary effect on such persons who agree

to avail themselves of psychiatric help (see Exhibit F)." But the source to which the Attorney General refers us—an affidavit of T. L. Clanon, M.D.. assistant superintendent in charge of psychiatric services at the California Medical Facility—describes the available group therapy as follows: "Such a person is placed in a group whose members suffer from a variety of mental problems. Since some inmates tend to look down on the exhibitionists, if such a person manages to overcome such intimidation and function adequately in such a masculine environment the group therapy will benefit him." We are not told what happens to the individual who does not "manage to overcome" that concerted peer scorn. At best, we suppose, he continues to serve his sentence until a new attempt is made; at worst, we can only presume that the ordeal confirms or even increases his prior feelings of insecurity and inadequacy. In any event, if this is the most optimistic treatment offered for exhibitionism in the most psychiatrically oriented institution in the Department of Corrections, the long prison sentence imposed by section 314 can hardly be justified as an act of benevolence towards the offender.

Finally, we may profitably compare section 314 with other California statutes which prescribe enhanced punishment for recidivism. First, however, we pause to note that in all but three of the above-listed dangerous crimes involving personal violence,. sexual assaults, or harm to children, there is no statutory provision increasing the penalty for recidivism. In other words, a man may repeatedly commit manslaughter or mayhem, assault with intent to commit rape or sodomy, child-beating or felony drunk driving. and still be subject each time to a lighter penalty than one who twice exposes his private parts.[21]

Second, of all the statutes which increase the punishment in the case of a second offense, only section 314 and one other compel the enormous single leap from an ordinary misdemeanor to a life-maximum felony.[22] In each of the remaining statutes there is a reasonable relationship between the punishments for the first and subsequent offenses. If the crime is of a minor nature, its enhanced penalty remains proportionately light;[23] if the crime is more

---

[21]The remaining three crimes (kidnaping, arson, and assault with intent to commit murder) are covered by the habitual criminal provisions of section 644. but even that statute does not come into play until the defendant has been separately convicted at least three times—not twice—of the crimes there specified.

[22]The other statute is Penal Code section 647a, which declares that every person who "annoys or molests" any child under the age of 18 is punishable, for a first offense, as a misdemeanant. The 1952 legislation which drastically increased the penalty for second-offense indecent exposure prescribed an identical penalty for a repetition of this crime. i.e., "not less than one year" in state prison. (Stats. 1953. First Ex. Sess. 1952, ch. 23, § 5. p. 382.) We do not, of course, adjudicate the constitutionality of the latter penalty in this proceeding.

[23]For example, the crime of disturbing the peace on a college campus (Pen. Code. § 415.5) is punishable, if a first offense, by a fine not exceeding $200 or a jail term

serious, its original penalty was proportionately heavy.[24] The theory in each instance is that whatever the response appropriate to the factor of recidivism, the judgment of the Legislature as to the gravity of the act itself should remain relatively constant.

This view is firmly expressed in the recommendation of the American Bar Association Advisory Committee on Sentencing and Review that in structuring habitual offender legislation "Any increased term which can be imposed because of prior criminality should be related in severity to the sentence otherwise provided for the new offense." (A.B.A. Project on Minimum Standards for Criminal Justice, Standards Relating to Sentencing Alternatives and Procedures (1967) p. 22, par. 3.3(a)(i).) By way of illustration the advisory committee pointed to a minor offense (intentionally damaging property in an amount exceeding $250) which, if repeated, could be punished under New York law by a life term. The committee explained (*id.* at p. 139) that "A sentence of this magnitude no longer bears any reasonable relationship to the event which triggered its possibility. The major thrust of the proceeding has shifted from the offense to the status of the offender. A proceeding which can result in such a long sentence ought to assume the burden of depending initially and primarily on the criteria which justify it, rather than employ the vehicle of a relatively minor felony to approach the same end indirectly." The committee concluded (*ibid.*) that such an indirect approach "gives rise to all manner of difficulties," including "the moral, if not legal, questions of cruel and unusual punishment."[25] Similar "difficulties" attend any attempt to justify the great disparity between the penalties for first and second offense indecent exposure in California.

Third, the increased punishment provided by section 314 is far more severe than those of other recidivist statutes penalizing conduct that is indisputably more serious. Thus, is it reasonable to suppose that a person who twice exposes himself is more dangerous to society than one who twice commits a felony while armed with a deadly weapon such as a gun, knife, or club? Yet the punishment for such repeated conduct (Pen. Code, § 12022,

---

not exceeding 90 days or both; if a second offense, by a jail term of 10 days to 6 months or by such term and a fine not exceeding $500.

[24]For example, the crime of possession of heroin for sale (Health & Saf. Code, § 11500.5) is punishable, if a first offense, by a term of 5-15 years; if a second offense, by a term of 10 years to life.

[25]In particular, the committee "would draw the line at felonies . . . and would not provide for increased punishment on the basis of repeated misdemeanors" (*id.* at p. 169), and as an example stated that "A life sentence for petty larceny reflects a loss of proportion which the Advisory Committee would suggest is intolerable" (*id.* at p. 164). (Compare Pen. Code, §§ 470, 666 and 667.)

par. 2; 10-15 years, consecutive) is itself less than the life maximum inflicted by section 314. The same is true of recidivist offenders who threaten public officials with bodily injury (Pen. Code, § 71; up to 5 years), employ minors to print or distribute obscene matter (Pen. Code, § 311.9. subd. (b); up to 5 years), forge prescriptions for narcotic drugs (Health & Saf. Code, § 11715; up to 10 years), and possess heroin or other narcotic (Health & Saf. Code, § 11500; 5-20 years). In each case they can repeat their crime without risking a penalty as severe as that decreed for a second-offense exhibitionist.

The last technique to be employed—a comparison of the challenged penalty with the punishments prescribed for the same offense in other jurisdictions—is no less revealing. A study of the indecent exposure statutes of each of our sister states and the District of Columbia reveals only two other states—Michigan and Oklahoma—which permit life-maximum sentences for second-offense exhibitionists. By contrast, 34 states and the District of Columbia do not enhance the punishment for any degree of recidivism; in each, indecent exposure remains a misdemeanor at all times. Of these 35 jurisdictions, the offense is punishable by no more than a fine in two states, by three years' imprisonment in one state, by a one-year maximum in 10 states, by a six-month maximum in 15 states, and by periods of 90 days or less in the remaining states. Seven other states do punish a second-offense indecent exposure more severely than the first; but none among these even approaches the life maximum decreed in California, and in one state the punishment for repeated exhibitionism is only 90 days. Three more states enhance the punishment only upon the third offense; of these none exceeds three years' imprisonment, and to reach even this penalty one requires that the three convictions occur within a five-year span. Finally, two states enhance punishment only if the second offense is committed on a minor.

Thus it is the virtually unanimous judgment of our sister states that indecent exposure, no matter how often it may recur, can be adequately and appropriately controlled by the imposition of a short jail sentence and/or a small fine. In this setting the California penalty of a life-maximum sentence in state prison strikes a discordant note indeed.

We end this comparative review by examining two well known model codes and a proposed revision of California's own criminal laws. Section 213.5 of the Model Penal Code of the American Law Institute (Proposed Official Draft 1962) would punish indecent exposure as a misdemeanor, i.e.,

by a maximum of one year's imprisonment and/or a fine up to $1,000. (§§ 6.03, 6.08.) Similarly, section 1852 of the proposed Federal Criminal Code prepared by the National Commission on Reform of Federal Criminal Laws (Study Draft 1970) would treat indecent exposure as a "class A misdemeanor," deeming it to be "a kind of public nuisance" (comment to § 1853). The commission suggests a one-year maximum term of imprisonment and/or a fine of up to $1,000. (§§ 3204, 3301.)

After lengthy legislative committee studies a proposed Criminal Code has been introduced in the California Legislature, replacing in large part the Penal Code. (Sen. Bill 1506, 1972 Sess.) Section 9312 of the new code would declare indecent exposure to be a "misdemeanor of the second degree," punishable by a county jail sentence not exceeding six months (§ 1303) and/or a fine not exceeding $500 (§ 1304). There is no provision for increasing this punishment upon a second or subsequent conviction of the offense. The proposed legislation, in short, would return the law of California to its posture during the eight decades preceding the 1952 amendment of Penal Code section 314.

Viewing the total disparity between the life-maximum sentence currently inflicted by section 314 for second-offense indecent exposure and the far lighter penalties in force in California and elsewhere, we conclude with Justice McKenna in *Weems* that "this contrast shows more than different exercises of legislative judgment. It is greater than that. It condemns the sentence in this case as cruel and unusual. It exhibits a difference between unrestrained power and that which is exercised under the spirit of constitutional limitations formed to establish justice." (217 U.S. at p. 381 [54 L.Ed. at p. 804].)

V

Not only does the punishment here fail to fit the crime, it does not fit the criminal. At the conclusion of the trial in this case the judge was moved to remark, "Mr. Lynch, before you leave, let me say to you in the utmost sincerity, it has been my impression from the very outset of this case that you are a man of great potential. You are a person of unusual appearance, you make a very pleasant appearance, obviously have the capacity to get along well with people, you are obviously a person of superior intellect."

The circumstances of the offense do not undermine this appraisal. This is not a case, for example, in which an exhibitionist forced himself on large numbers of the public by cavorting naked on a busy street at high noon. Instead, a very different picture emerges. The prosecuting witness was a "carhop" or waitress on the night shift at a drive-in restaurant. She testified

that between midnight and 1 a.m. petitioner drove into the restaurant area, alone in his car. He first parked in the rear lot, where no car service was provided. Subsequently he moved his vehicle closer and asked the waitress for a cup of coffee. When she returned with a second cup he inquired what time the restaurant would close, and she told him 2:45 a.m. He instructed her to bring him a fresh cup of coffee whenever she thought the previous cup might be cold, explaining that he didn't want to "bother" her. Accordingly, about half an hour later and without being called, the waitress approached petitioner's car with another cup of coffee. A siren happened to be sounding in the street at that moment, and petitioner was looking in its direction, away from the waitress. As she stood by his window she saw the fly of his pants open, his hand on his erect penis, and a "pin-up" magazine open on the front seat next to him. When petitioner heard her put the coffee down on his tray he turned, saw her, and said "Oops." The waitress left immediately. Some 15 minutes later, however, she assertedly observed him from a distance through a rearview mirror on his car and saw he was still exposed. The incident was then reported to the police, and petitioner was placed under arrest.

Some idea of the nature of the prosecution's case can be gleaned from the reasoning of the trial court in denying a motion for new trial. The court explained there would be "great merit" in petitioner's position that the exposure was inadvertent "if he had ceased and desisted as soon as the waitress came up to the car and he said 'Oops.' But the evidence was that he didn't cease and desist at that point. He continued for a long period of time thereafter, as evidenced by the fact that the waitress again saw it through the mirror. *He may not have known the mirror was in the position that it was in.* But his conduct [in] continuing over in that period of time demonstrates a clear willful and reckless disregard for the consequences of his conduct." (Italics added.)

For this single act petitioner has now spent more than five years in state prison—three and a half of those years in the maximum security confines of Folsom. The Adult Authority has four times denied him release on parole, and has never fixed his sentence at any term less than the life maximum prescribed by section 314.

We recite these facts simply to illustrate the vast disproportion between the conduct of which petitioner was convicted and the punishment he has suffered—and still faces. The fault does not lie in the theory of the indeterminate sentence law, but in the unreasonably high maximum term prescribed for this offense. "If a reasonable maximum sentence were passed, this system could have much to commend it. But when the Court imposes

a sentence of 'from one year to life,' . . . the sentence can assume an altogether different character." (*Condemned Without Hope in California* (1971) 7 The Review (International Commission of Jurists) 17, 18.)

For the reasons stated herein, the recidivist provision of section 314 is void under article I, section 6, of the California Constitution.[26]

## VI

The question of relief remains. If petitioner's offense is treated as a misdemeanor, he has long since served his time. If it is treated as a felony, section 314 no longer prescribes a valid punishment; and if no provision is made for punishment in a statute declaring a felony, the offense is "punishable by imprisonment in any of the state prisons, not exceeding five years" (Pen. Code, § 18). Petitioner has now served more than five years, and is therefore entitled to his freedom.

The writ is granted and petitioner is ordered discharged from custody.

Wright, C. J., Peters, J., Tobriner, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I dissent. I would deny the writ.

Respondent's petition for a rehearing was denied January 3, 1973.

---

[26]In Crim. No. 16232 petitioner also contends the Adult Authority has deprived him of due process and equal protection of the law by predicating its repeated denial of parole on (1) alleged additional acts of indecent exposure which petitioner has not been given an opportunity to rebut and (2) his steadfast refusal to confess to committing those acts. In view of the disposition we adopt herein, we need not reach this issue at the present time.

In Crim. No. 16237 petitioner contends his prior conviction of indecent exposure in 1958 was invalid because he was assertedly denied various constitutional rights at that proceeding. This contention, however, has been raised in several prior applications for habeas corpus by petitioner, each of which we have denied. Accordingly, it does not require our reconsideration. (*In re Miller* (1941) 17 Cal.2d 734, 735 [112 P.2d 10].)