Filed 9/17/13  P. v. Huynh CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D062250 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD234518) |
| UT VAN HUYNH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, George W. Clarke, Judge.  Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Annie Featherman Fraser, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Ut Van Huynh was charged by information, alleging he had sexually abused his daughter, L.H. The information charged Huynh with two counts of sexual intercourse with a child under the age of 10 in violation of Penal Code section 288.7, subdivision (a),[1] one count of a lewd act upon a child in violation of section 288, subdivision (a), and four counts of oral copulation with a child under the age of 10 in violation of section 288.7, subdivision (b).[2] One count of oral copulation was dismissed. A jury found Huynh guilty of both counts of sexual intercourse with a child under 10 (counts 1 & 2). The jury could not reach a verdict on the remaining counts of oral copulation and a lewd act upon a child (counts 3 through 6), and the judge declared a mistrial as to those counts. The court sentenced Huynh to state prison for a total term of 50 years to life for counts 1 and 2, and dismissed counts 3 through 6.

Huynh contends the judgment must be reversed because (1) he did not make a knowing and intelligent waiver of his *Miranda*[3] rights, therefore the trial court wrongfully admitted his confession; and (2) his sentence constitutes cruel and unusual punishment under the California and United States constitutions. We affirm.

---

[1]     All further statutory references are to the Penal Code unless otherwise noted.

[2]     Section 288.7 provides: "(a) Any person 18 years of age or older who engages in sexual intercourse or sodomy with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 25 years to life. [¶] (b) Any person 18 years of age or older who engages in oral copulation or sexual penetration, as defined in Section 289, with a child who is 10 years of age or younger is guilty of a felony and shall be punished by imprisonment in the state prison for a term of 15 years to life."

[3]     *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).

2

FACTUAL AND PROCEDURAL BACKGROUND

Huynh lived with his wife and two daughters—L.H., age eight, and her sister, age two—in a one bedroom apartment. His wife worked and went to school, and Huynh worked as a welder at NASSCO. Huynh grew up in Vietnam but had lived in the United States for the previous 22 years working various jobs in the fishing and welding industries.

On May 26, 2011, L.H. approached her second grade teacher, Eleanor M. during recess. Eleanor M. immediately felt something was wrong, as L.H. merely stood at her desk with tears in her eyes. When Eleanor M. asked what was wrong, L.H. explained in her limited English that her father was sexually abusing her. L.H. was crying and looked terrified. After it became clear to Eleanor M. there was a problem, she notified her principal as well as Child Protective Services. The school nurse then brought L.H. to her office. The nurse noticed L.H. walking gingerly and not being able to sit still. When the nurse asked if L.H. needed to use the bathroom, L.H. pointed to her crotch and said, "Hurt, hurt" and "Daddy hurt." L.H. also made a hand gesture, inserting the pointer finger of one hand into a circle made by the other. When offered water, L.H. said, "Pee hurt. Water bad." When the nurse convinced L.H. to use the restroom, she saw bruises on L.H.'s thigh and arms. She also observed L.H.'s labia appeared as if it had a scarring effect, and her wrists appeared to have scars as if something had been wrapped too tightly around them.

Marilyn Kaufold, M.D., examined L.H. later that evening. Dr. Kaufold observed a bruise on L.H.'s inner thigh and a hyperpigmented band on one of her wrists. Her

3

examination of L.H.'s genitals revealed her structures appeared to be uninjured and age appropriate.

Detective Timothy Williams of the San Diego Police Department interviewed Huynh that same evening. Huynh confessed to putting his "dick" in L.H.'s "pussy" because L.H. wanted his love. He said he told L.H. that if she told her mother, he would send her to Vietnam. Huynh also confessed to a second instance of intercourse with L.H. that happened in the bathroom, but denied any oral copulation. Huynh then wrote two apology letters, one to the police and one to L.H.

A few days later, a forensic interviewer spoke with L.H. L.H. again said Huynh had sexually abused her and gave details of particular instances. Later, in June, L.H. met with a protective services worker, who had L.H. draw a picture of what worried or scared her. L.H. drew a picture of her father with a penis and herself with a vagina, explaining while she drew that her father had hurt her.

At trial, the prosecution presented the foregoing evidence, along with the testimony of L.H. and various experts. L.H. testified that Huynh had sex with her "a lot" in his bedroom and one time in the bathroom. She also testified that Huynh had her orally copulate him "a lot." L.H. said Huynh continued the abuse even after she told her mother.

Dr. Kaufold testified that in a majority of cases, children who have been sexually abused do not have physical findings upon examination. A forensic child abuse specialist testified that children often delay disclosing their abuse, particularly if they are close to their abuser or if an initial disclosure to a parent does not produce a responsive or

4

protective reaction. She also testified that when children discuss their abuse, they often have difficulty sequencing the events chronologically.

The defense presented the testimony of Raymond Murphy, Ph.D., a psychologist who evaluated Huynh, and Lynne Ticson, M.D., a pediatrician. Dr. Murphy testified that Huynh denied sexually abusing his daughter. Dr. Murphy also testified that Huynh was acquiescent and eager to please, had an I.Q. of 74 in the mild mental retardation range, and was not, in Dr. Murphy's opinion, a pedophile or sexual deviant. Dr. Ticson testified that, in her opinion, sexual penetration of an eight-year-old victim could not happen without physical findings on the child's genital structures.

DISCUSSION

I. *THE ADMISSIBILITY OF HUYNH'S STATEMENTS UNDER MIRANDA*

Huynh first contends the court should have suppressed the statements he made during his interview with Detective Williams. Specifically, he contends that based on his low I.Q., his poor English skills, and an inadequate translation of his *Miranda* rights, he did not, and could not, make a knowing and intelligent waiver of those rights. Huynh further contends the admission of his statement was prejudicial error. We reject these contentions.

A. *Background*

1. *The interview*

Following his arrest, Huynh was interviewed by Detective Williams. Special Agent Johnson Pham of the United States Department of Homeland Security was present for the entire interview as a Vietnamese interpreter. Agent Pham is fluent in both

5

Vietnamese and English. The interview was conducted predominantly in English, but Huynh asked Agent Pham for clarification in Vietnamese when needed.

Detective Williams started by asking several preliminary questions. Detective Williams asked about Huynh's birth date, work, height and weight, tattoos, wife and kids, address, phone number, previous encounters with law enforcement, drug and alcohol use, and health concerns. Huynh appeared to understand most of the questions and answered appropriately. When he did not understand, he asked Agent Pham to translate in Vietnamese and then responded appropriately in English.

Before questioning Huynh about his daughter's allegations, Detective informed Huynh of his *Miranda* rights:

> "WILLIAMS: Alright? And, uh, obviously you've been placed under arrest and, um, and, uh, even though we took the handcuffs off you, you're still under arrest, okay?
>
> "HUYNH: Okay.
>
> "WILLIAMS: And, um, but I, I wanna talk to you about a case that I'm investigating and, um, but before I talk to you about that, I wanna tell you what your rights are, okay?
>
> "HUYNH: Yes.
>
> "WILLIAMS: And then I want to give you an opportunity, uh, afterwards, okay? Now, um, do you prefer that the rights be read to you in English or in Vietnamese?
>
> "HUYNH: (Unintelligible) Vietnamese.
>
> "WILLIAMS: Would you prefer them in Vietnamese?
>
> "HUYNH: A little bit English not, I not go to school for, just go to (unintelligible).

6

"PHAM:  Uh, that's gonna be really hard.

"WILLIAMS:  Is it?

"PHAM:  Mm-hmm.

"WILLIAMS:  Um, okay.  So what I'm gonna do is I'm gonna tell you, I'm gonna tell you what your rights are and he's gonna translate for me.

"HUYNH:  Yes.

"WILLIAMS:  Alright?

"HUYNH:  Yeah.

"WILLIAMS:  How about we do it that way?  Or unless you wanna read it or do you wanna, or kind of—

"PHAM:  Well, we'll see if he—

"WILLIAMS:  So what I wanna—go ahead.

"PHAM:  We'll see if he doesn't understand it . . .

"WILLIAMS:  Okay.

"PHAM:  . . . and then I can.

"WILLIAMS:  You have the right to remain silent, do you understand that?

"HUYNH:  Uh, I don't understand (unintelligible).

"PHAM:  *You have the right not to answer.  You have the right to remain silent.*[4]

"HUYNH:  *I don't understand.  Does it mean that if he ask then I do not say anything?*

---

4      Italics indicate English translation from Vietnamese.

"PHAM: (Unintelligible). He asked me, 'So basically if he asks me anything I don't have to answer, right?' And I said, 'That's correct.'

"WILLIAMS: Oh, c— okay, correct. So you understand that? If you give up the right to remain silent, anything you do say can and will be used in court against you.

"PHAM: *Do you understand?*

"HUYNH: No.

"PHAM: No.

"WILLIAMS: In other words, if you talk to me, anything that you say can be used in court.

"PHAM: *Whatever you answer to him, he can use it in court, do you understand?*

"HUYNH: *No, at the what?*

"PHAM: *Oh, in court.*

"HUYNH: Alright.

"PHAM: Mm-hmm. [¶] . . .

"WILLIAMS: Um, you have the right to speak with an attorney of your choice before I, before questioning and to have an attorney present during questioning.

"PHAM: *Understand?*

"HUYNH: *No.*

"PHAM: *You have the right to hire or retain a lawyer to talk to and answer the questions he will ask before he asks.*

"HUYNH: Okay.

"WILLIAMS: Okay. If you cannot afford an attorney, one will be appointed for you by the court prior to any questioning if you so

8

desire.  The attorney will not cost you anything, those services are free.

"PHAM:  *If you have no money, the government will hire a lawyer for you and you do not to* [*sic*] *pay any money for the lawyer.*

"WILLIAMS:  Okay.  Do you understand each of these rights that's I've just expla—that I have just explained to you?  So do you understand it?  So you, you actually said you understood us, us each time.

"PHAM:  *Do you understand all the questions that he has asked?*
"HUYNH:  *I understood this sentence only.*

"PHAM:  *Which one?*

"HUYNH:  *The one that he just asked.*

"PHAM:  He said, he said the last question is the only one that he under, he really understood.

"WILLIAMS:  The, the last question what?

"PHAM:  Is the only one that he understood.  *Didn't you understand the others?*

"HUYNH:  *If you ask the regular thing, casual, then I understand, but the law I didn't study, didn't go to school.*

"PHAM:  No, he says that, he said, he d—he doesn't know like the laws because he didn't go to school.

"WILLIAMS:  Alright, okay.  But I'm trying to explain to you that before I can talk to you about what's taking place . . .

"HUYNH:  Yeah.

"WILLIAMS:  . . . I have to tell you what your rights are.
"HUYNH:  Oh, okay.

"PHAM:  *Before asking you, he wants to advise you of your rights.*

"HUYNH:  Yeah.

9

"PHAM: *Do you understand?*
"HUYNH: Yes.

"WILLIAMS: Okay. So do you understand?
"HUYNH: Yeah.

"WILLIAMS: Okay. Are you willing to talk to me about the case?

"HUYNH: Yeah."

Detective Williams then told Huynh that L.H. said he had sexually abused her. Huynh confessed to having sexual intercourse with L.H. earlier in May 2011, saying she "wanted [his] love" and that he put his "dick" in her "pussy." Huynh denied L.H. orally copulated him and denied he orally copulated her. Huynh also stated L.H. had told his wife, who said she would call the police if it happened one more time.

Huynh also confessed to having sexual intercourse with L.H. in their bathroom the previous summer, but again denied any oral copulation. He also admitted putting Vaseline on his penis during that encounter.

Huynh stated the intercourse happened only on those two occasions and repeatedly denied Detective Williams's suggestions that it happened two or three days before the interview. Huynh then wrote two letters, one to the police and one to L.H., saying he was sorry and would accept punishment if he ever did it again.

2. *Huynh's motion to suppress*

Huynh's attorney filed a motion to suppress, arguing Huynh lacked the capacity to knowingly, intelligently, and voluntarily understand his rights to remain silent and have counsel present before and during questioning. At the suppression hearing, the defense

10

presented the testimony of Dr. Murphy, who had conducted a forensic evaluation of Huynh, which included tests for mental status, intelligence, substance abuse, and sexual violence.

Dr. Murphy testified that Huynh presented information poorly and appeared to have difficulty with memory and dates. His report indicated Huynh had overall low cognitive skills. Huynh's performance on the intelligence screening tests placed him in the second percentile in mathematics and the first percentile for reading in English. The test results revealed Huynh has an I.Q. of 74, which is in the borderline range of mild mental retardation. Dr. Murphy also testified to Huynh's limited acculturation to American society. After watching his interview, Dr. Murphy opined that he did not believe Huynh knew what a right was and that Huynh appeared to look for the response he should give.

On cross-examination, Dr. Murphy acknowledged that Huynh had translated his letters into English, had used the English slang words "dick" and "pussy" of his own accord, and had not assented to or acquiesced in Detective Williams's questions at least seven times throughout the interview.

The court denied Huynh's motion. The court found by a preponderance of the evidence a knowing, voluntary, and intelligent waiver that was not the product of any coercion.

B. *Legal Principles*

To prevent government officials from exploiting the coercive nature of "incommunicado interrogation" (*Miranda, supra,* 384 U.S. at p. 445) in a police-

dominated atmosphere and to preclude defendants from making statements that are not the product of free choice, *Miranda* mandated certain procedural safeguards: Any person who is suspected or accused of a crime and has been taken into custody may not be interrogated by police unless he first knowingly and intelligently waives his right to remain silent, to the presence of an attorney, and to appointed counsel if indigent. (*Miranda*, *supra*, 384 U.S. at pp. 444-445, 458, 467.) Statements obtained in violation of *Miranda* are inadmissible to prove the accused's guilt in a criminal prosecution. (*Id*. at p. 476.) The prophylactic rule of *Miranda* is designed to insure the Fifth Amendment right against compulsory self-incrimination is protected. (*Michigan v. Tucker* (1974) 417 U.S. 433, 444, 446.)

A *Miranda* waiver is knowing and intelligent if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." (*Moran v. Burbine* (1986) 475 U.S. 412, 421.) A waiver is valid if the defendant comprehended "'all of the information that the police are required to convey' by *Miranda*." (*People v. Clark* (1993) 5 Cal.4th 950, 987, quoting *Moran v. Burbine*, *supra*, at p. 427.) As the Supreme Court has stated:

> "The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. . . . The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The *Miranda* ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him." (*Colorado v. Spring* (1987) 479 U.S. 564, 574.)

The validity of a *Miranda* waiver depends upon the totality of the circumstances. (*People v. Whitson* (1998) 17 Cal.4th 229, 246-247.) Relevant factors include the defendant's age, education, experience, intelligence, mental and physical condition at the time of questioning, and familiarity with law enforcement. (*In re Anthony J.* (1980) 107 Cal.App.3d 962, 972.) The prosecution must demonstrate the validity of the defendant's waiver by a preponderance of the evidence. (*People v. Whitson, supra*, at p. 248.)

As to our scope of review, "issues relating to the suppression of statements made during a custodial interrogation must be reviewed under federal constitutional standards." (*People v. Nelson* (2012) 53 Cal.4th 367, 374.) "'We must accept the trial court's resolution of disputed facts and inferences, and its evaluations of credibility, if they are substantially supported. [Citations.] However, we must independently determine from the undisputed facts, and those properly found by the trial court, whether the challenged statement was illegally obtained.'" (*People v. Bradford* (1997) 14 Cal.4th 1005, 1033.) Alternatively stated, we apply the de novo standard of review to the extent "the trial court's underlying decision entails a measurement of the facts against the law." (*People v. Waidla* (2000) 22 Cal.4th 690, 730.) However, we still "'"give great weight to the considered conclusions'" of a lower court that has previously reviewed the same evidence." (*People v. Whitson*, *supra*, 17 Cal.4th at p. 248.)

C. *Analysis*

After reviewing the recorded interview and transcripts, we conclude the trial court correctly determined Huynh made a knowing and intelligent waiver. Huynh's contentions that he lacked the capacity to waive his rights because of his low I.Q., his

13

poor English skills, and the inadequate reading and translation of the *Miranda* rights are unavailing.5 The totality of the circumstances show Huynh had sufficient intelligence and understanding of the English language to validly waive his rights, and that the translation of the warnings reasonably conveyed his *Miranda* rights.

1. *Huynh's low I.Q. and ability to speak English*

First, although Dr. Murphy found Huynh had an I.Q. of 74 that placed him on the borderline of mild mental retardation, a low I.Q. is not ""a proper basis to assume lack of understanding, incompetency, or other inability to voluntarily waive the right to remain silent under some presumption that the *Miranda* explanation was not understood.""" (*People v. Lewis* (2001) 26 Cal.4th 334, 384 [a confession given by a 13-year-old paranoid schizophrenic was knowing and intelligent].) "'A confession of a crime is not inadmissible merely because the accused was of subnormal intelligence" (*People v. Jenkins* (2004) 122 Cal.App.4th 1160, 1171), intelligence is just one of many factors to consider in determining the validity of a waiver. (*Ibid.*) Indeed, several cases have held that defendants with even lower I.Q.'s could knowingly and intelligently waive their *Miranda* rights. (See *In re Norman H.* (1976) 64 Cal.App.3d 997, 1001 [15-year-old boy with an I.Q. of 47 had capacity to validly waive *Miranda* rights]; *People v. Watson*

---

5 We note that Huynh relies heavily on the case *People v. Jiang* (2005) 130 Cal.App.4th 1512 as precedent. In his reply brief, Huynh tries to assert that there are two *People v. Jiang* opinions, one citable and one not. After reviewing the case history, we have determined that no version of *People v. Jiang* is citable; each version was ordered depublished by the Supreme Court. Thus, Huynh cannot rely on it as authority, and we shall not address his contentions as they relate to it.

(1977) 75 Cal.App.3d 384, 396-397 [adult defendant with organic brain damage, schizophrenia, and an I.Q. of 65 had capacity to validly waive *Miranda* rights].)

Though Huynh's I.Q. and cognitive skills may be below average, they did not impact his capacity to understand and validly waive his *Miranda* rights. He had lived in the United States for 22 years, had maintained a job as a welder in San Diego, and had held previous welding and fishing jobs around the country. He had attended school to the 10th grade in Vietnam and obtained technical training here in the United States.

There is no requisite level of intelligence or sophistication to trigger a defendant's ability to validly waive his *Miranda* rights. A defendant does not have to "know and understand every possible consequence" (*Colorado v. Spring*, *supra*, 479 U.S. at p. 574) or even "understand the tactical advantage[s]" (*United States v. Hernandez* (1990) 913 F.2d 1506, 1510) of invoking his rights in order to validly waive. (*Ibid.*) "All that is required is that the defendant comprehend" the information in the *Miranda* warnings (*People v. Clark* (1993) 5 Cal.4th 950, 987, disapproved on other grounds by *People v. Doolin* (2009) 45 Cal.4th 390, 421.) We cannot say that Huynh's intelligence rendered him unable to comprehend the information about his rights.

Second, while we agree Huynh's proficiency in English was lower than the average person, it was not so limited as to affect his ability to validly waive his *Miranda* rights. Mere difficulty with English does not preclude a finding of a valid waiver. (See *United States v. Bernard S.* (9th Cir. 1986) 795 F.2d 749, 752 [concluding that, despite having some problems with English, the defendant validly waived his rights when they were explained to him and he indicated that he understood].) "Although language

15

barriers may inhibit a suspect's ability to knowingly and intelligently waive his *Miranda* rights, when a defendant is advised of his rights in his native tongue and claims to understand such rights, a valid waiver may be effectuated." (*United States v. Hernandez, supra*, 913 F.2d at p. 1510.)

Here, Huynh conversed with Detective Williams primarily in English throughout the entire interview.  It is apparent that Huynh understood and appropriately responded to the preliminary questions, giving detailed information about his background.  In responding rationally and appropriately to the questions, Huynh showed he had a sufficient understanding of English.  Detective Williams's questions about L.H.'s allegations also demonstrate Huynh's grasp of the English language.  To describe the sexual acts with his daughter, he used the slang words "dick" and "pussy" of his own volition without any suggestion from the detective.  Further, he demonstrated sufficient understanding of English by admitting to some allegations, such as the intercourse, but denying others, such as the oral copulation.  Huynh's English-speaking abilities are further demonstrated by the fact that he has lived here for more than two decades, has maintained a job, and has been able to carry on meaningful conversations in English with others, such as L.H.'s teacher, Eleanor M..  The evidence does not suggest that the language barrier inhibited Huynh's ability to knowingly and intelligently waive his rights.

Furthermore, any difficulties in understanding English that arose throughout the interview were cured by the constant presence of a Vietnamese interpreter.  Huynh utilized Agent Pham when he became confused or did not know a word, such as when Detective Williams asked if Huynh was simply "curious" about L.H.  Huynh also used

16

Agent Pham during the reading of the *Miranda* rights and, after hearing the Vietnamese translation, indicated his understanding in English. Huynh demonstrated that he knew how to obtain help with the questions when he needed it; that the majority of the interview took place in English indicates Huynh felt comfortable with the language. Any language barrier here does not preclude a finding of a knowing and intelligent waiver.

2. *The reading and translation of the Miranda rights*

Huynh also raises a number of issues regarding the reading and translation of the *Miranda* warnings. Huynh contends the warnings were deficient because (1) Agent Pham was not a certified interpreter; (2) neither the detective nor Agent Pham confirmed Huynh understood his right to remain silent; (3) Huynh did not appear to understand that anything he said could be used against him in court; (4) Huynh did not appear to understand he had a right to an attorney during questioning; and (5) Agent Pham inadequately translated the right to a free attorney. These contentions are also unavailing.

First, Huynh cites no authority, and we have found none, that requires a *certified* interpreter to translate the *Miranda* rights. In fact, our Supreme Court has held the standards for court interpreters have no application to interpreters who are merely facilitating a police investigation by reading *Miranda* rights. (*People v. Marquez* (1992) 1 Cal.4th 553, 571 [upholding the defendant's confession to a police officer who could fluently speak Spanish as to everyday matters and read the defendant's rights in Spanish from a card].)

Second, after reviewing the videotaped interview, we conclude it is apparent Huynh did understand his rights. Agent Pham explained each of Huynh's rights in

17

Vietnamese. When Huynh was confused, he asked for, and received, clarification. For example, Agent Pham told Huynh in Vietnamese, "*You have the right not to answer. You have the right to remain silent.*" Huynh replied, "*I don't understand. Does it mean that if he ask then I do not say anything.*" Agent Pham then nodded his head to Huynh. Agent Pham clearly explained to Huynh his right to remain silent; he even paraphrased Detective Williams's words to make sure Huynh understood. Huynh's question, "Does it mean that if he ask then I do not say anything," and Pham's affirmative nodding show that Huynh comprehended that he did not have to answer the detective's questions. Huynh demonstrated the same level of comprehension as to each other right, verbalizing an "okay" or "alright" after hearing the Vietnamese translation. That is all *Miranda* requires. (See *People v. Clark*, *supra*, 5 Cal.4th at pp. 987-988.)

Third, Agent Pham adequately translated the *Miranda* rights to Vietnamese. A translation of *Miranda* rights need not be perfect so long as it reasonably conveys the rights. (See *Duckworth v. Egan* (1989) 492 U.S. 195, 203.) "[N]o talismanic incantation [is] required" to satisfy *Miranda*'s strictures. (*California v. Prysock* (1981) 453 U.S. 355, 359.) Agent Pham's translation reasonably conveyed that Huynh had the right to speak with an attorney before questioning by saying, "*You have the right to hire or retain a lawyer to talk to and answer the questions he will ask before he asks.*" Agent Pham then clearly translated, "*If you have no money, the government will hire a lawyer for you and you do not have to pay any money for the lawyer.*" These two statements together reasonably conveyed to Huynh that he could speak with an attorney prior to questioning and that he could get a free, appointed attorney if needed.

18

Finally, any failure by Detective Williams to get an express waiver or indication of understanding after each right does not preclude a finding of a knowing and intelligent waiver. We note that police officers are not required to read each right individually and separately. Officers can, and frequently do, read the *Miranda* rights all at once and still may subsequently obtain a valid waiver. (See, e.g., *People v. Smith* (2007) 40 Cal.4th 483, 499-503.) Furthermore, a defendant, through his words and conduct, can impliedly waive his *Miranda* rights by acknowledging that he understands his rights and then answering questions. (*People v. Whitson*, *supra*, 17 Cal.4th at p. 250.) Detective Williams did not need to obtain an "I understand" from Huynh after reading each right.

Based on the totality of the circumstances, we conclude Huynh was adequately informed of his *Miranda* rights, and he had the capacity to knowingly and intelligently waive those rights. The trial court did not err in denying the motion to suppress. Because we find no error in admitting the statements, the issue of prejudice is moot.

## II. *CRUEL AND UNUSUAL PUNISHMENT*

Huynh also contends that his sentence of 50 years to life in state prison constitutes cruel and unusual punishment in violation of both the California and United States constitutions (Cal. Const., art. I, § 17; U.S. Const., 8th Amend.). Huynh points to (1) his lack of criminal history, (2) California's imposition of lesser punishment on more serious crimes, and (3) other states' imposition of lesser punishment for similar crimes to support his contention. We reject his contentions.

19

A. *The Sentencing Hearing*

At the sentencing hearing, Huynh's counsel made essentially the same arguments Huynh raises on appeal. L.H.'s foster parents both addressed the court to describe the numerous issues L.H. has faced since the abuse. Her foster mother said L.H. refused to use toilet paper and had difficulty washing for months because she did not want to touch her private area. She described how L.H. was afraid to fall asleep and still needs a light on. She further indicated how the abuse has impacted L.H. academically, causing her to be three to four grades behind in school and to discuss the abuse in class. L.H. struggles with her self-esteem and with understanding why this happened to her.

The court imposed the sentence of 25 years to life on each of the two counts. The judge listed several factors in support of his decision, such as the counts involving separate times and places, the nature of the offense, Huynh's attempts to cover up his acts by threatening L.H., and the violation of "the most sacred position of trust" between a father and daughter.

B. *Standard* of *Review*

"Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment." (*People v. Martinez* (1999) 76 Cal.App.4th 489, 496.) Our Supreme Court has held "'the final judgment as to whether the punishment it decrees exceeds constitutional limits is a judicial function.'" (*In re Lynch* (1972) 8 Cal.3d 410, 414.) However, "a court should not lightly encroach on matters which are uniquely in the domain of the Legislature." (*People v. Wingo* (1975) 14 Cal.3d 169, 174). Thus, our

20

inquiry "commences with great deference to the Legislature. Fixing the penalty for crimes is the province of the Legislature, which is in the best position to evaluate the gravity of different crimes and to make judgments among different penological approaches. [Citations.] Only in the rarest of cases could a court declare that the length of a sentence mandated by the Legislature is unconstitutionally excessive." (*People v. Martinez*, *supra*, at p. 494.)

### C. *California Constitutional Standards*

#### 1. *Applicable legal principles*

Article I, section 17 of the California Constitution provides: "Cruel or unusual punishment may not be inflicted or excessive fines imposed." Section 24 of that article mandates that California courts interpret the California cruel or unusual punishment prohibition in a manner consistent with the federal Constitution. A punishment may "violate the constitutional prohibition not only if it is inflicted by a cruel or unusual method, but also if it is grossly disproportionate to the offense for which it is imposed." (*People v. Dillon* (1983) 34 Cal.3d 441, 478, fn. omitted.) The defendant must overcome a "considerable burden" to establish his punishment is cruel and unusual. (*People v. Wingo*, *supra*, 14 Cal.3d at 174.)

To determine the constitutionality of a punishment, our Supreme Court has devised a three-prong inquiry. (See *In re Lynch*, *supra*, 8 Cal.3d at pp. 425-429.) The first prong evaluates the nature of the offense and the nature of the offender, particularly the danger either presents to society. (*People v. Dillon, supra,* 34 Cal.3d at p. 479.) In looking at the nature of the offense, courts consider the offense in the abstract and totality

21

of the circumstances surrounding the defendant's commission of the offense, including factors like "motive, the way it was committed, the extent of [his] involvement, and the consequences of his acts." (*Ibid.*) In looking at the nature of the offender, courts consider "whether the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind." (*Ibid.*)

The second prong compares the penalty for the instant offense with the punishments proscribed in the same jurisdiction for a different offense which is deemed more serious. (*In re Lynch*, *supra*, 8 Cal.3d at p. 426.) Notably, a determination of cruel and unusual punishment may be based solely on the first prong (see *People v. Weddle* (1991) 1 Cal.App.4th 1190, 1198-1200), but not solely on the second (see *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 530-531).

The final prong compares the punishment for the instant offense with punishment for the same offense in other jurisdictions. (*In re Lynch*, *supra*, 8 Cal.3d at p. 436.)

Ultimately, the test in California for cruel and unusual sentences is whether the sentence "is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch*, *supra*, 8 Cal.3d at p. 424, fn. omitted.)

2. *Analysis*

a. *Nature of the offense and offender*

We conclude that neither the nature of the offense nor the nature of Huynh compel any finding of cruel and unusual punishment in the 50-year-to-life sentence. Considering

22

the offenses in the abstract, these were felony sex crimes involving a child under the age of 10. (See §§ 17, 288.7, subd. (a).) The gravity of the acts is compounded by the age and vulnerability of the victim. The mandatory sentence of 25 years to life "reflects the Legislature's zero tolerance toward the commission of sexual offenses against particularly vulnerable victims. (*People v. Alvarado* (2001) 87 Cal.App.4th 178, 200-201.) Moreover, the commission of the crimes was, as Huynh admits, "heinous." The acts occurred twice, at separate times and at separate locations with Huynh's home. Huynh violated "the most sacred position of trust" between a father and a daughter by engaging in sexual acts with L.H. L.H. said, and Huynh acknowledged, that his acts caused her pain. Huynh told L.H. that if she told her mother what he had done, he would send her to Vietnam. The consequences of Huynh's acts have already had detrimental effects on L.H.'s self-esteem, performance at school, and peace of mind; the trauma will likely follow her for a long time, and the full extent of the damage remains to be seen.

The nature of the offender does not undermine our conclusion. Huynh contends that because he had no prior criminal history and was at an age whereby for much of his sentence he would be a very old man, the sentence should be considered cruel and unusual. However, age and lack of criminal record are "far from determinative [and] "the seriousness of the crime and the circumstances surrounding its commission substantially outweigh these factors." (*People v. Szadziewicz* (2008) 161 Cal.App.4th 823, 845.) Moreover, the "combined effect of [the defendant's] age and the length of sentence are of no consequence." (*Ibid.*) The nature of the offender here includes the fact that Huynh was the victim's father. He was a 44-year-old man when he engaged in sexual

23

intercourse with his eight-year-old daughter; he violated a position of trust, knowing it was wrong. Given the reprehensible nature of the offense and the offender, a term of 25 years to life for each offense is not so disproportionate as to constitute cruel and unusual punishment.

b. *Comparison of punishment for more serious offenses in California*

Huynh points to several "more serious" crimes in California that are punished less severely. He observes first degree murder also carries a 25-year-to-life sentence, and second degree murder carries a sentence 10 years fewer than the one imposed here. He also asserts the sentence for sexual intercourse with a child is substantially longer than the upper terms for both mayhem and kidnapping.

We express no opinion as to whether mayhem and kidnapping are actually more serious crimes than sexual intercourse with a child under 10 years; suffice to say that the Legislature has shown it considers sexual intercourse with a child to be the graver offense by mandating a more serious term. As to Huynh's comparisons to murder sentences, we note that first degree murder is actually treated more severely than Huynh's crime, as it is also punishable by death. Furthermore, arguments that constitutionally no crime can be punished more severely than murder have been rejected. (*People v. Estrada* (1997) 57 Cal.App.4th 1270, 1281.) As noted, *ante*, we give great deference to the Legislature's determinations of crimes and punishments. We decline to question here the Legislature's zero tolerance policy for sex crimes against vulnerable victims such as children. That Huynh's punishment could also be imposed on a person who committed two willful and premeditated murders does not prove cruel and unusual punishment. Thus, we reject

24

Huynh's contention that his sentence is excessive in light of California's punishments for other offenses.

  c. *Comparison of punishments for the same crime in other jurisdictions*

  Huynh compares the punishment of his crimes to the New York statutes for sexual conduct against a child to suggest his sentence is cruel and unusual. Huynh notes that under New York law, when a person engages in two more acts of sexual conduct with a child under the age of 11 in a period not less than three months, they receive a punishment of five to 25 years in state prison. (See N.Y. Pen. Code, §§ 70.02, subd. (3)(A) & 130.75, subd. (1)(A)).

  However, several other states have punishments for sexual conduct with children that are similar to those in California. For example, Montana's statute for incestuous sexual intercourse with a child under the age of 12 mandates a punishment of 100 years in state prison. (Mont. Code Ann. § 45-5-507, subd. (5)(a)(i).) In South Dakota, the maximum sentence for first degree rape of a child under the age of 10 is life imprisonment; under that statute, the Supreme Court of South Dakota upheld the defendant's punishment of two life sentences plus 100 years for his conviction for three counts of rape of his two minor daughters. (*State v. Peterson* (S.D. 1996) 557 N.W.2d 389, 393.) Likewise, under Kansas law, which utilizes the same test for cruel and unusual punishment as California, the Kansas Supreme Court ruled the juvenile defendant's life sentence with a mandatory minimum term of 25 years for aggravated sodomy of a child did not constitute cruel and unusual punishment. (*State v. Breeden*

25

(Kan. 2013) 304 P.3d 660.) California's sentencing scheme is not so extreme when compared to other states.

Furthermore, even if California had the most severe sentencing scheme for sexual offenses against a child, that fact alone would not render Huynh's sentence cruel and unusual. (*People v. Martinez*, *supra*, 71 Cal.App.4th at p. 1516). Our constitution "does not require California to march in lockstep with other states in fashioning a penal code. It does not require 'conforming our Penal Code to the "majority rule" or the least common denominator of penalties nationwide.'" (*Ibid.*)

Thus, after applying the *Lynch* prongs, we conclude Huynh's sentence does not constitute cruel and unusual punishment under the California constitution.

D. *United States Constitutional Standards*

1. *Applicable legal principles*

The Eighth Amendment to the United States Constitution, which applies against the states under the Fourteenth Amendment, provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." (*Harmelin v. Michigan* (1991) 501 U.S. 957, 962.) This includes not only punishments that are barbaric, but also those that "are disproportionate to the crime committed." (*Solem v. Helm* (1983) 463 U.S. 277, 284.) While strict proportionality between the crime and the punishment is not required, the Eighth Amendment forbids "extreme sentences that are 'grossly disproportionate' to the crime." (*Harmelin v. Michigan*, *supra*, at p. 1001 (conc. opn. of Kennedy, J.), citing *Solem v. Helm*, *supra*, at pp. 288, 303.)

Successful proportionality challenges to noncapital punishment sentences are "'exceedingly rare.'" (*Rummel v. Estelle* (1980) 445 U.S. 263, 374.)

In *Solem*, the United States Supreme Court set out a three-prong test similar to the one adopted in California to address claims of disproportionate sentences:

> "[A] court's proportionality analysis under the Eighth Amendment *should* be guided by objective criteria, including (i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." (*Solem v. Helm*, *supra*, 463 U.S. at p. 292.)

However, the Court subsequently restricted this test, stating the comparative analyses of the second and third prongs is appropriate only when the analysis of the first prong "leads to an inference of gross disproportionality." (*Harmelin v. Michigan*, *supra*, 501 U.S. at p. 1005.)

2. *Analysis*

Our analysis of the gravity of the offense and the harshness of the penalty leads us to the same conclusion reached under the California standards. Huynh's crimes were particularly grave; sexual intercourse with a child under 10 is severe enough in and of itself, but Huynh's crime is compounded by his abuse of the father-daughter relationship. Thus, we conclude his sentence was not grossly disproportionate to his crime. Because we determine there is no inference of gross disproportionality, we will not conduct the comparative analysis under the second and third prongs. In any event, our analysis would parallel the one discussed, *ante*, under the California constitutional standards. Huynh's sentence does not constitute cruel and unusual punishment under the Eighth Amendment.

27

DISPOSITION

The judgment is affirmed.

NARES, Acting P. J.

WE CONCUR:

McINTYRE, J.

IRION, J.