Filed 8/30/23  P. v. Palumbo CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JOHN MICHAEL PALUMBO,<br><br>    Defendant and Appellant. | D081085<br><br><br><br>(Super. Ct. No. ECR12126) |

APPEAL from an order of the Superior Court of San Diego County, Robert O'Neill, Judge.  Affirmed.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Senior Assistant Attorney General, Arlene A. Sevidal, Randal D. Einhorn and Andrew Mestman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant John Michael Palumbo filed a motion to initiate a proceeding under *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*) to preserve youth-related mitigation evidence to use at a future youth offender

parole hearing. The trial court denied the motion, reasoning that Palumbo has no right to a *Franklin* proceeding because: (1) Penal Code section 3051 denies youth offender parole hearings to inmates serving sentences of life in prison without parole (LWOP) for offenses they committed after attaining age 18; and (2) Palumbo was no longer 18 when he committed his offense. In so ruling, the court rejected Palumbo's arguments that section 3051 violates the United States and California Constitutions' guarantees of equal protection for similarly situated classes of offenders and freedom from cruel and/or unusual punishment. We affirm the judgment.

I.

Factual and Procedural Background

Palumbo's sentence arises from a botched robbery that caused the death of an innocent passerby, some 28 years ago, when Palumbo was 22 years old. According to the prosecution:

> "On July 24, 1995, Darrell Ray Hawkins, Jr., 18, planned to spend the night with his girlfriend, who lived with her mother in a condominium complex. [S]hortly before midnight, [he] proceeded to his girlfriend's residence.
>
> "At 12:15 a.m. [on July 25, 1995], as Hawkins was passing by unit 240, which was downstairs from his girlfriend's unit, he was accosted by Palumbo. Palumbo had been hiding in the bushes along with a companion as part of a plan to rob the occupants of unit 240 and had become impatient. Palumbo placed a .357 magnum revolver to Hawkins's head and ordered him to open the door to unit 240. When Hawkins said he did not live there, Palumbo pulled the hammer back on the gun to intimidate Hawkins and reiterated his order. As Palumbo was using the gun to push Hawkins through the door, the gun accidentally fired. Hawkins died from a single gunshot wound to the back of his head. Soot and markings around the entrance wound indicated the gun was in contact with the head when it was fired."

(*People v. Palumbo* (April 30, 1998, D026419) [nonpub. opn.], review granted July 29, 1998, S070875; review dismissed Oct. 18, 2000 (*Palumbo*). At trial, Palumbo denied the prosecution's account. (*Palumbo, supra,* D026419.) However, he nonetheless was convicted of special-circumstances first degree felony-murder (*ibid.*);[1] and in June of 1996 the trial court, pursuant to legislative mandate, sentenced him to LWOP.[2]

Later that year Palumbo appealed the judgment, assigning error to the conviction, but not to the sentence (*Palumbo, supra,* D026419); and in 1998 this court affirmed the judgment.

According to the materials he submitted in support of his request for a *Franklin* proceeding, Palumbo appears to have matured considerably over the course of the next 24 years. Those materials include accolades from 10 correctional officers, some of high rank, who have observed Palumbo in the institutions in which he has been housed over the years and who describe him as a drug-free, humble, compassionate, selfless, role-model inmate with an exceedingly positive influence on efforts of fellow inmates to rehabilitate and improve themselves. Also in Palumbo's submission are statements by other correctional staff, by 15 fellow inmates, and by an inmate's sister all to similar effect, and writings of Palumbo acknowledging guilt, expressing shame, remorse, and regret, and stating an intention to make of his life "a

---

[1]    The jury also convicted Palumbo of conspiracy to commit residential robbery and attempted residential robbery, and further found the murder had occurred during the commission of the attempted robbery for purposes of a robbery-murder special circumstance allegation. (*Palumbo, supra,* D026419.)

[2]    At sentencing, the trial judge stated: "[B]y law, pursuant to Penal Code section[s] 189, 190 and 190.2, the punishment mandated is life in prison without possibility of parole."

3

living amends" for the behavior that led to his incarceration. In addition, the submission includes evidence of Palumbo's voluntary participation—as a student, a mentor, a facilitator, and a leader—in educational and rehabilitative programs that appear to have been substantial in number and in depth.[3]

In 2022 Palumbo filed the motion that is the subject of this appeal. The motion contends that Palumbo is entitled to a *Franklin* evidence-preservation proceeding (also known as a *Franklin* hearing) and the appointment of counsel to help effectuate his rights in connection with such a proceeding. As noted *ante,* the trial court issued an order denying the motion; and on October 13, 2022 Palumbo timely appealed the order.

## II.

### Discussion

Palumbo bases his claimed entitlement to a *Franklin* proceeding on two arguments that challenge the constitutionality of Penal Code section 3051: (1) an argument that section 3051 "violates his state and federal constitutional rights of equal protection under the Fourteenth Amendment and article I, section 7 of the California Constitution;" and (2) an argument that section 3051 "renders his sentence unconstitutionally cruel and/or unusual under article I, section 17 of the California Constitution and the Eighth Amendment [to] the United States Constitution." To place these arguments in context, we begin with a discussion of the provenance and

---

[3]     These programs include prison course work focused on self-improvement topics such as substance abuse, anger management, alternatives to violence, victim awareness, criminal thinking, gangs, recidivism, vocational training, parole suitability, and the like. They also include classes that have led to Palumbo being awarded a G.E.D. and five associate degrees.

substance of Penal Code section 3051, youth offender parole hearings, and *Franklin* proceedings. Then we turn to an assessment of Palumbo's constitutional challenges.

A.    Penal Code Section 3051 and Youth Offender Parole Hearings

Penal Code section 3051 came into existence in 2013 as a legislative response to a series of watershed opinions by the United States and California Supreme Courts mandating, as a matter of constitutional law, that certain attributes of youth be considered in the sentencing of persons convicted of crimes they had committed when they were juveniles—meaning under the age of 18. (See Stats. 2013, ch. 312, § 1; *Franklin, supra,* 63 Cal.4th at p. 277; *County of San Diego v. Commission on State Mandates* (2023) 91 Cal.App.5th 625 (*Commission on State Mandates*).)

These watershed opinions included: *Roper v. Simmons* (2005) 543 U.S. 551 (*Roper*), in which the United States Supreme Court (the Supreme Court or the Court) held that the Eighth Amendment prohibits death sentences for juveniles); *Graham v. Florida* (2010) 560 U.S. 48, in which the Court held that the Eighth Amendment prohibits LWOP sentences for juveniles convicted of nonhomicide offenses; *Miller v. Alabama* (2012) 567 U.S. 460 (*Miller*), in which the Court held that the Eighth Amendment prohibits mandatory LWOP sentences for juvenile offenders and requires that a juvenile's age and various other mitigating factors be taken into account when imposing sentence; and *People v. Caballero* (2012) 55 Cal.4th 262, in which the California Supreme Court held that the Eighth Amendment prohibits de facto LWOP sentences for juveniles convicted of nonhomicide offenses.

Among the elements underpinning each of these opinions was the Court's conclusion, based in large measure on scientific and sociological

studies, that juveniles are different from adults inasmuch as: (1) juveniles lack maturity and thus are more prone to impetuous and ill-considered actions; (2) juveniles are more susceptible to negative influences and outside pressures, including peer pressure; and (3) the character of a juvenile is not as well formed as that of an adult and thus has a heightened capacity for change. (See, e.g., *Roper*, *supra*, 543 U.S. at pp. 569-570.)

Motivated by these opinions, the Legislature enacted a set of reforms that included Penal Code section 3051. (*People v. Acosta* (2021) 60 Cal.App.5th 769, 776 (*Acosta*).)

> "As originally enacted, [Penal Code] section 3051 required the Board of Parole Hearings (hereafter, the Board), a state agency, to conduct parole hearings known as youth offender parole hearings for most juvenile offenders who were under the age of 18 when they committed their controlling offenses.[4] (Pen. Code, former § 3051, subds. (b), (d), added by Stats. 2013, ch. 312, § 4.) The law required the Board to hold a youth offender parole hearing during a juvenile offender's 15th year of incarceration in cases where the offender was sentenced to a determinate sentence, during a juvenile offender's 20th year of incarceration in cases where the offender was sentenced to a life term of less than 25 years to life, and during a juvenile offender's 25th year of incarceration in cases where the offender was sentenced to 25 years to life. (*Id.,* subd. (b)(1)-(3).)"

(*Commission on State Mandates, supra,* 91 Cal.App.5th at p. 634.)

Over time, the Legislature extended the reach of the sentencing reforms embodied in section 3051 by expanding the section's scope in a manner that rendered youth offender parole hearings available not just to most juvenile offenders, but also to most persons convicted of crimes they had

---

4    " ' "Controlling offense" means the offense or enhancement for which any sentencing court imposed the longest term of imprisonment.' " (Pen. Code § 3051, subd. (a)(2)(B)).

6

committed when they were young adults—meaning older than juveniles but under the age of 26 (*Commission on State Mandates, supra,* 91 Cal.App.5th at pp. 634-635).  Thus, for example:

> " 'In 2015, the Legislature expanded [Penal Code] section 3051 to apply to offenders who committed crimes at the age of *23* or younger.'
>
> "Then, in 2017, the Legislature further amended Penal Code section 3051 to apply 'to offenders who committed the controlling offense when *25* years old or younger.' "

(*Commission on State Mandates, supra,* 91 Cal.App.5th at pp. 634-635, italics added.)

> "In addition, in the 2017 legislation raising the threshold age to 25, the Legislature extended youth parole hearings in the 25th year of incarceration to [persons] sentenced to life without the possibility of parole for a controlling offense committed before the age of 18.' "

(*Commission on State Mandates,* at p. 635.)

As a result of the foregoing, as presently constituted (and subject to certain exceptions):  Subdivision (b)(1)-(3) of section 3051 operate to afford a youth offender parole hearing to an offender who was either a juvenile or a young adult at the time that he committed a controlling offense for which he has been sentenced to a determinate or life term; subdivision (b)(4)[5] operates to afford such a hearing to an offender who was a juvenile—*but not to such an offender who was a young adult*—at the time that he committed a controlling offense for which he has been sentenced to LWOP; and subdivision (h)

_____

[5]    Subdivision (b)(4) of Penal Code section 3051 states in pertinent part that:  "A person who was convicted of a controlling offense that was committed before the person had attained 18 years of age and for which the sentence is life without the possibility of parole shall be eligible for release on parole at a youth offender parole hearing during the person's 25th year of incarceration.

7

reinforces the carve out of LWOP-sentenced young adults (like Palumbo) from the benefits of subdivision (b)(4) by stating that such offenders are *not eligible for a youth offender parole hearing at all.*[6] (See *People v. Jackson* (2021) 61 Cal.App.5th 189, 194-195 (*Jackson*); *Commission on State Mandates, supra,* 91 Cal.App.5th at p. 636.)

Certain aspects of section 3051 have led to expressions of misgivings by reviewing courts. (See, e.g., *Acosta, supra,* 60 Cal.App.5th at pp. 780-781; *Jackson, supra,* 61 Cal.App.5th at pp. 201-202 (conc. opn. of Dato, J.); *id.,* at p. 202 (stmt. of Liu, J).) For example, in reviewing section 3051's legislative history, a panel from the second division of this court expressed a concern as to whether excluding LWOP-sentenced young adults from the youth offender parole hearing process is consistent with section 3051's purpose and legislative history.

> "We do have some reservations . . . . After all, in amending section 3051 to encompass young adult offenders, the Legislature expressly recognized that cognitive brain development continues into the early 20s or later, and the parts of the brain that are still developing during this process affect judgment in ways that are highly relevant to criminal behavior. Since the Legislature has determined a 17-year-old who is sentenced to life or LWOP for committing a crime when his or her brain is not yet fully developed should receive a youth offender parole hearing after 25 years of incarceration, a 21-year-old sentenced to LWOP for committing a crime when his or her brain is not yet fully developed should arguably receive the same hearing. We are also mindful of the public policy purpose of the statute, which is to permit the eventual evaluation of

---

[6] Subdivision (h) of Penal Code section 3051 states in pertinent part: "This section shall not apply to cases . . . in which an individual is sentenced to life in prison without the possibility of parole for a controlling offense that was committed after the person had attained 18 years of age."

8

a young offender who committed a serious offense before reaching full cognitive and emotional maturity with an eye toward determining whether that individual has become fit to return to society. Arguably an LWOP offender and a non-LWOP offender are equally capable of gaining maturity, so we question whether the exclusion for young adult LWOP offenders from this process is consistent with the statute's purpose and legislative history."

(*Acosta, supra,* 60 Cal.App.5th at pp. 780-781.) Other jurists noting this same tension (including a member of this panel) have in recent years expressed an "invit[ation] [to] the Legislature to reconsider whether our evolving knowledge of brain development suggests that unalterable judgments about individuals based on what they did between age 18 and 25 may be unjustifiable." (*Jackson, supra,* 61 Cal.App.5th at pp. 201-202 (conc. opn. of Dato, J.); *id.,* at p. 202 (stmt. of Liu, J).) However, most (though not all[7]) of these jurists have nonetheless held back from concluding that section 3051 is in any aspect unconstitutional. (See, e.g., *Jackson, supra,* at p. 202 (conc. opn. of Dato, J.).)

B.    *Franklin* Proceedings

As noted *ante,* the kind of proceeding Palumbo requested in his motion, and that the trial court denied, is not a youth offender parole hearing before the state's Board of Parole Hearings. Instead it is an altogether different kind of proceeding—a *Franklin* proceeding—before an altogether different organ of the government: the trial court itself.

As this court recently explained, the term *"Franklin* proceeding" derives from "a seminal case" in which the California Supreme Court "address[ed] the interplay between the State's youth offender parole hearing

---

[7]    (See, e.g., *People v. Hardin* (2022) 84 Cal.App.5th 273, review granted Jan. 11, 2023, S277487 (*Hardin*).)

system and juvenile offenders' claims of constitutional error under *Miller."* (*Commission on State Mandates, supra,* 91 Cal.App.5th at p. 635.) In that case—*Franklin*—the Court "observe[d] that the youth offender parole system 'contemplate[s] that information regarding the juvenile offender's characteristics and circumstances at the time of the offense will be available at a youth offender parole hearing to facilitate the Board's consideration,' . . . [citations]," but that "[a]ssembling such statements 'about the individual before the crime' is typically a task more easily done at or near the time of the juvenile's offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away." (*Commission on State Mandates, supra,* at p. 636, citing *Franklin, supra,* 63 Cal.4th at pp. 283-284.)

Thus the Court devised a formal process for the purpose of gathering and preserving such evidence that has since come to be known as a *Franklin* proceeding.

> "[T]he *Franklin* court remanded the matter for the trial court . . . to receive submissions from the parties and testimony, if appropriate. (*Franklin, supra*, 63 Cal.4th at p. 284.) The *Franklin* court determined that the defendant may, at the proceeding, 'place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors.' (*Ibid.*) According to the *Franklin* court, the goal of such a proceeding is 'to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board [of Parole Hearings], years later, may properly discharge its obligation to "give great weight to" youth-related factors [citation] in determining whether the

10

offender is "fit to rejoin society" despite having committed a serious crime 'while he was a child in the eyes of the law' [citation].' (*Ibid.*) These proceedings are commonly known as *Franklin* proceedings."

(*Commission on State Mandates, supra,* at pp. 636-637. See also *In re Cook* (2019) 7 Cal.5th 439, 449.) In other words, the sine qua non of a *Franklin* proceeding is the offender's entitlement to a future youth offender parole hearing.

It is for this reason that the trial court concluded that Palumbo's LWOP sentence—which precludes him from receiving such a parole hearing in the future (see Penal Code § 3051(h))—defeats his claimed entitlement to a *Franklin* proceeding. And it is for the same reason that the primary focus of Palumbo's appeal is the constitutionality of section 3051.

## C. The Constitutional Challenges

As mentioned *ante,* in support of his contention that the trial court erred in denying his motion for a *Franklin* proceeding, Palumbo advances two arguments, each of which is rooted in the California and United States Constitutions. Palumbo's first argument is predicated on state and federal constitutional requirements mandating equal protection for similarly situated classes of persons, and his second argument is predicated on state and federal constitutional requirements proscribing cruel and/or unusual punishment.

In advancing these arguments, however, Palumbo is not merely seeking a judicial determination that he is entitled to a *Franklin* proceeding. More fundamentally, he is seeking a judicial determination that he is entitled to *a parole hearing*. For while this appeal may appear on the surface to challenge only the denial of Palumbo's request for a *Franklin* proceeding, in practical effect it is the equivalent of a petition that Palumbo be adjudged (in the

11

words of section 3051, subdivision (b)(4)) to be "eligible for release on parole at a youth offender parole hearing" *notwithstanding* (1) the fact that subdivision (b)(4) renders only *juvenile* LWOP offenders "eligible for release on parole,"[8] (2) the fact that Palumbo is a *young adult,* not a juvenile, and (3) the fact that subdivision (h) of section 3051 unambiguously states that young adult LWOP offenders are *in*eligible for release on parole. Indeed, absent such an adjudication, what would be the point of the requested *Franklin* proceeding (or, for that matter, of a subsequent youth offender parole hearing) for an incarcerated offender who, by virtue of an LWOP sentence, is *not eligible* for release on parole?

    1.    The Equal-Protection Challenge

Turning to Palumbo's argument that Penal Code section 3051 violates his state and federal constitutional rights to equal protection, we begin by noting that this is an argument that many courts of appeal in California have considered and as to which, at least in its federal constitutional dimension, we understand briefing to have been recently completed in an appeal currently pending before the California Supreme Court. (Cf. *Hardin, supra*, 84 Cal.App.5th 273, rev. granted.)

Insofar as the jurisprudence of *this* court of appeal is concerned, in February of 2021 a panel of this division expressly concluded in *Jackson* that "the carve out to section 3051 for offenders . . . serving an LWOP sentence for special circumstance murder is not an equal protection violation." (*Jackson, supra,* 61 Cal.App.5th at p. 192; see also *id.,* at pp. 200-201 (conc. opn. of Dato, J.) ["I agree with the majority that the exception in . . . section 3051,

<hr>

8    In keeping with the discussion of section 3051 *ante,* the phrase "eligible for release on parole," as used in section 3051, does not mean entitled to be *released* on parole; rather, it means entitled to be *considered* for parole.

subdivision (h) for persons who were between 18 and 25 when they committed their offense and were sentenced to . . . LWOP . . . does not violate the equal protection guarantees of the United States and California Constitutions."].)  Thus we view Palumbo's equal protection argument as, in essence, a request that this court reconsider the reasoning of the panel that decided *Jackson.*

The problem with this request, however, is that Palumbo has presented us with neither evidence nor binding precedent to warrant a departure from the opinion that this court expressed, just two and a half years ago, in *Jackson.*  We certainly respect the well-reasoned opinions of our fellow jurists who have arrived at conclusions at odds with the conclusion this court reached in *Jackson.*  (See *Hardin, supra,* 84 Cal.App.5th at pp. 288-291, rev. granted.)  And we add our voices to those of jurists in this district, in other districts, and beyond who, as noted *ante,* have expressed misgivings regarding section 3051's exclusion of LWOP-sentenced young adults from eligibility for youth offender parole hearings.

But, having been presented with no new information (such as, for example, studies shedding light on further advances in the science of brain development) or new binding precedent, we are unwilling to disturb the well-reasoned opinions (*Jackson, supra,* 61 Cal.App.5th 189 [maj. opn.]) and *id.,* at p. 200 [conc. of Dato, J.]) expressed by our colleagues in that case.  As this court has stated:

> "Respect for our colleagues and the orderly administration of justice—as well as the need of the trial bench, bar and litigants for certainty in the development of the . . . law— dictate that there be a compelling reason before we overrule a decision of another panel of this court.  Mere disagreement with the result or reasoning of an earlier decision does not, in our view, constitute a compelling reason."

13

(*Opsal v. United Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1203-1204 (*Opsal*); see also *Estate of Sapp* (2019) 36 Cal. App. 5th 86, 109, fn. 9 ["Absent a compelling reason, the Courts of Appeal are normally loath to overrule prior decisions from another panel of the . . . same division."]).

"In view of this court's commitment to stare decisis—particularly where it concerns opinions by other panels of this court—we do not believe the current case should serve as a forum for rearguing the merits" of the equal protection issue that was decided in *Jackson*.  (*Opsal, supra,* 2 Cal.App.4th at p. 1204; *Tansavatdi v. City of Rancho Palos Verdes* (2023) 14 Cal.5th 639, 666 [" ' "[i]t is, of course, a fundamental jurisprudential policy that prior applicable precedent usually must be followed even though the case, if considered anew, might be decided differently by the current justices"], quoting *Sierra Club v. San Joaquin Local Agency Formation Com.* (1999) 21 Cal.4th 489, 503-504 and citing *Trope v. Katz* (1995) 11 Cal.4th 274, 288 ["a party urging us to overrule a precedent faces a rightly onerous task"], and *Kisor v. Wilkie* (2019) 139 S.Ct. 2400, 2422 ["any departure from [stare

decisis] demands 'special justification' "].)[9] Moreover, we are further confirmed in our belief that it would be imprudent for us to disturb our *Jackson* precedent by the fact that the California Supreme Court is soon to consider and resolve this very issue. (See *Hardin, supra*, 84 Cal.App.5th 273, rev. granted.) Hence we here reiterate the conclusion in *Jackson* that "the

[9] As illustrated in the recent opinion of the court of appeal in *In re Delila D.* (2023) 93 Cal.App.5th 953 (*Delila D.*) and in this court's opinion in *CPF Vaseo Associates, LLC v. Gray* (2018) 29 Cal.App.5th 997 (*CPF Vaseo*), the principle of stare decisis does not *always* prevent us from reconsidering a rule of law expressed in a previous decision. In *Delila D.,* the majority of a panel in another division in this district concluded it was compelled to deviate from a previous decision because the previous decision (a) "departed from earlier decisions of our court," (b) was "based on a plain error of statutory construction that is easily corrected" and that, if not corrected, "would significantly undermine the purpose of" the statutes therein at issue, and (c) was "of recent origin, meaning neither courts nor the public have yet placed significant reliance on it." (*Delila D.,* at pp. 975-976.) In the present circumstances, it cannot reasonably be said that the opinion of the panel deciding *Jackson* departed from jurisprudence then in effect or that *Jackson* is premised on a misconstruction of section 3051. As to whether courts or the public might reasonably be said to have placed significant reliance on *Jackson,* we are not in a position to say. We do, however, note that the conclusion expressed in *Jackson* to the effect that "the carve out to section 3051 for offenders . . . serving an LWOP sentence for special circumstance murder is not an equal protection violation" (see *ante*) appears to be the prevailing view among the district courts of appeal.

In *CPF Vaseo*, a panel of this division deviated from a decision—*San Diegans for Open Government v. City of San Diego* (2016) 247 Cal.App.4th 1306 (*San Diegans for Open Government*)—in which the earlier panel interpreted Code of Civil Procedure section 128.5. In so doing, the court in *CPF Vaseo* noted that "the decision to reach a legal conclusion that differs from an opinion by another panel of this court is not one we make lightly," but that it was persuaded to make that decision "[i]n light of the legislative history of—and especially the significance of the subsequent clarifying amendment to—[the Code of Civil Procedure provision in issue]." (*CPF Vaseo*, at p. 1005.) No such legislative change or amendment is presented here.

15

carve out to section 3051 for offenders . . . serving an LWOP sentence for special circumstance murder is not an equal protection violation," and, on that basis, we decline to disturb the conclusion of the trial court in the present case that Palumbo's ineligibility for a youth offender parole hearing under section 3051 is not a denial of equal protection.

Having addressed Palumbo's equal-protection challenge, we now turn to his cruel-and/or unusual-punishment challenge.

2.      The Cruel-and/or Unusual-Punishment Challenge

The thrust of Palumbo's cruel and/or unusual punishment challenge is an argument that the advent (via amendments to section 3051) of young adults with sentences less severe than LWOP being eligible for youth offender parole hearings has rendered Palumbo's LWOP sentence cruel and/or unusual, and that Palumbo should be adjudged eligible for parole on this basis.[10]  But there are several problems with this argument.

First, nothing in section 3051 alters the sentence that the trial court imposed on Palumbo in 1998.  That sentence, by its terms, rendered Palumbo ineligible for release on parole, and neither the introduction of section 3051 nor any amendment to section 3051 changes this fact.  Thus, the time for

_____

[10]      Elaborating on this argument, Palumbo contends:  (a) that the fact that the Legislature, via its amendments to section 3051, "has embraced the concept that certain classes of offenders who were under 26 years of age at the time of commission of the offense and received lengthy sentences should be given the possibility of parole," means that "the Legislature has implicitly determined that youthful offenders committing offenses when they are under 26 years of age are less culpable than those committing offenses after they turn 26;" and (b) that "[t]he fact [that a] death occurred during the commission of a robbery does not alter the Legislative recognition that youthful offenders under the age of 26 have an immature mentality, as discussed in *Miller* and its progeny, that requires [that] the youthful offender be given the opportunity to demonstrate he should one day be paroled."

16

Palumbo to have appealed from the parole-precluding aspect of the sentence that the trial court meted out to him in June of 1996 was *in 1996,* via the same direct appeal with which he elected to challenge his conviction—not 26 years later, in 2022, via the current appeal.[11]  By failing to challenge his sentence as cruel and/or unusual as part of the direct appeal he initiated in 1996, Palumbo has forfeited his ability to challenge the sentence now.

Second, the Eighth Amendment[12] component of Palumbo's argument has, in essence, already been foreclosed by the California Supreme Court.  As the Second District Court of Appeal has in recent years observed in considering an Eighth Amendment challenge being mounted by a young adult LWOP offender who had committed his controlling offense at age 21 (i.e., one year younger than the age at which Palumbo committed *his* controlling offense):

> "To the extent petitioner contends an LWOP sentence is an unconstitutional cruel and unusual punishment when imposed on *any* 21-year-old defendant, we observe our Supreme Court has essentially rejected that very argument in the context of the death penalty.  In *People v. Flores* (2020) 9 Cal. 5th 371, 429, the court acknowledged research that youths ages 18 to 21 share many of the same cognitive and developmental deficiencies as adolescents under age 18.  [But] . . . the court nonetheless held that 18 is ' "the age

[11]     We express no opinion as to whether the filing in state or federal court of a petition for a writ of habeas corpus (as distinguished from the filing of this appeal) for the purpose of mounting a challenge to Palumbo's sentence or to Penal Code section 3051, subdivisions (b)(4) or (h) on the basis of the Eighth Amendment or of article I, section 17 of the California Constitution would be timely or otherwise appropriate at this juncture.

[12]     The Eighth Amendment to the United States Constitution provides that:  "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted."

> at which the line for death eligibility ought to rest." ' If the Eighth Amendment does not prohibit a sentence of death for 21 year olds, then most assuredly, it does not prohibit the lesser LWOP sentence."

(*In re Williams* (2020) 57 Cal.App.5th 427, 439 (*Williams*).)

Third, the component of Palumbo's argument that is based on article I, section 17 of the California Constitution[13] is almost wholly unsupported. As a threshold matter, in considering article I, section 17, it is important to note that, whereas the Eighth Amendment to the *United States* Constitution forbids punishment that is "cruel *and* unusual" (italics added), article I, section 17 of the *California* Constitution by contrast forbids punishment that is "cruel *or* unusual"[14] (italics added); and this distinction matters.

> "Unlike its federal counterpart, [article I, section 17] forbids cruel *or* unusual punishment, a distinction that is purposeful and substantive rather than merely semantic. [Citations.] For that reason, it is construed separately from the federal prohibition against cruel and unusual punishment."

---

[13] Article I, section 17, of the California Constitution provides that: "Cruel or unusual punishment may not be inflicted or excessive fines imposed."

[14] California is not the only state with an Eighth Amendment analog that renders a sentence unconstitutional if it is cruel, irrespective of whether it also is unusual. (See, e.g., Mich. Const. art. I, § 17 ("cruel or unusual punishment"), *People v. Parks* (Mich. Sup. Ct. 2022) 987 N.W.2d 161, 169 (*Parks*)), Wash. Const. art. I, § 14 ("cruel punishment"), *Pers. Restraint of Monschke* (2021) 482 P.3rd 276, 279, fn. 6 (*Monschke*).)

(*People v. Carmony* (2005) 127 Cal.App.4th 1066, 1085 (*Carmony*).)[15]

Under California's Constitution, " 'no prisoner can be held for a period grossly disproportionate to his or her individual culpability for the commitment offense' " because " '[s]uch excessive confinement . . . violates the cruel or unusual punishment clause (art. I, § 17) of the California Constitution' " (*Williams, supra,* 57 Cal.App.5th at p. 437; see also *Carmony, supra,* 127 Cal.App.4th at p. 1085), and "[w]hether a sentence is 'grossly disproportionate' to an offense is measured by 'circumstances existing at the time of the offense' " (*Williams,* at p. 437), rather than by circumstances existing at some time in the future. Courts typically consider three techniques for evaluating a claim of cruel or unusual punishment. (*Carmony,* at p. 1085. [discussing *In re Lynch* (1972) 8 Cal.3d 410, 424–427.) " ' "[A] petitioner attacking his sentence as cruel or unusual must demonstrate his punishment is disproportionate in light of (1) the nature of the offense and defendant's background, (2) the punishment for more serious offenses, or

---

15    Notably, the distinction between punishment that is "cruel *or* unusual" (or simply "cruel") on the one hand and punishment that is "cruel *and* unusual" on the other hand has been held by the highest courts in at least two states to be the determining legal factor in deciding whether a mandatory LWOP sentence meted out to a young adult is constitutional or unconstitutional. (See, *Parks, supra,* 987 N.W.2d at p. 183 [stating "that mandatorily subjecting 18-year-old defendants convicted of first-degree murder to a sentence of life without parole . . . constitutes unconstitutionally cruel punishment under . . . art. 1, § 16" of the Michigan Constitution], *Monschke, supra,* 482 P.3rd at pp. 306, 325-326 [stating that, "[w]hen it comes to mandatory LWOP sentences," the state of Washington's constitutional proscription against the imposition of cruel sentences requires that "*Miller's* constitutional guaranty of an individualized sentence—one that considers the mitigating qualities of youth—must apply to defendants at least as old as [20] at the time of their crimes"].)

19

(3) punishment for similar offenses in other jurisdictions." ' " (*Williams, supra,* 57 Cal.App.5th at p. 437.)

But, in this case, Palumbo has made no showing (other than his age at the time of the offense, plus a few scattered references to his upbringing) to enable a court to make a meaningfully informed assessment as to technique number one, and he has made no showing at all regarding technique numbers two and three. Nor has he supplied the court with any scientific or sociological evidence more current than that considered in *Roper* (indeed, he has not supplied any such evidence at all) regarding advances in experts' understanding of brain development[16] that could help us evaluate whether subdivisions (b)(4) and (h) of section 3051 might be unduly restrictive to the point of violating article I, section 17 of the California Constitution.

### III.

### Conclusion

Though it may seem like cold comfort to one who has been incarcerated for as many years as Palumbo has, we nonetheless commend the commitment Palumbo has exhibited to personal growth—both his own and that of his fellow inmates. This commitment is of enormous and abiding value irrespective of whether the Legislature ends up "reconsider[ing] . . . 'whether our evolving knowledge of brain development suggests that unalterable judgments about individuals based on what they did between age 18 and 25 may be unjustifiable' " (*Jackson, supra,* 61 Cal.App.5th at p. 202 (stmt. of Liu,

---

[16] We note from our review of the majority opinions in *Parks, supra,* 987 N.W.2d 161 (decided in 2022) and *Monschke, supra,* 482 P.3rd 276 (decided in 2021), as well as from the dissenting opinion in *Dorsey v. State* (Iowa Sup. Ct. 2022) 975 N.W.2d 356, 365-380 (dis. opn. of Appel, J.), that evidence of such more recent advances may be available. But that evidence is not before us on this appeal.

J. [quoting in part *id.,* at pp. 201-202 (conc. opn. of Dato, J.)])).  On this note, we do not foreclose the possibility that a path to the Board of Parole Hearings may one day become open to Palumbo.  That path, however, is not through the present appeal.

## IV.
### Disposition

The judgment is affirmed.

KELETY, J.

WE CONCUR:

DATO, ACTING P.J.

DO, J.